THE QUEEN.

THE UMATILLA.

(Circuit Court of Appeals, Ninth Circuit.   June 12, 1913.)

Nos. 1,850, 1,851.

1. PILOTS (§ 10*)—TENDER OF SERVICES—CONSTRUCTION OF STATE STATUTE.

In Pol. Code Cal. § 2466, requiring every vessel spoken inward or outward bound to or from the port of San Francisco, with certain exceptions, to pay pilotage fees, the provision that "a vessel is spoken by day by a pilot boat displaying a union jack or by night displaying a torch or flare-up within a distance of 3 miles of the vessel," does not exclude other methods of tendering the services of a pilot nor require the tender

to be made to an outgoing vessel after she is under way, and an oral offer of service made on board a vessel while moored to a wharf and within an hour of her sailing time is a valid tender under the statute.

[Ed. Note.—For other cases, see Pilots, Cent. Dig. §§ 11–13; Dec. Dig. § 10.*]

2. PILOTS (§ 13*)—COMPENSATION—LIEN.

Pol. Code Cal. § 2432, which provides that "all vessels * * * and the master and owners thereof are jointly and severally liable for pilotage fees, to be recovered in any court of competent jurisdiction," and section 2466, which makes every vessel of certain classes which is spoken when bound into or out of the harbor of San Francisco liable for pilotage fees, create a valid maritime lien for such fees, whether the services are accepted or not, which is enforceable by suit in rem in a court of admiralty.

[Ed. Note.—For other cases, see Pilots, Cent. Dig. § 16; Dec. Dig. § 13.*]

3. COMMERCE (§ 78*)—COMPENSATION OF PILOT—STATUTES—CONSTITUTIONALITY—TONNAGE.

The fact that by the pilotage laws of a state the pilotage fees fixed are based in part on the tonnage of the vessel, and that a percentage of such fees is required to be paid to the state pilot commissioners, does not render the statute unconstitutional as imposing a tonnage duty.

[Ed. Note.—For other cases, see Commerce, Cent. Dig. §§ 54–60; Dec. Dig. § 78.*]

Appeal from the District Court of the United States for the Northern District of California; John J. De Haven, Judge.

Suits in admiralty by M. Anderson against the steamship Queen, and by N. Jordan against the steamship Umatilla; Pacific Coast Steamship Company, claimant. Decrees for claimant, and libelants appeal. Reversed.

For opinion below, see 184 Fed. 537.

William Denman and Denman & Arnold, all of San Francisco, Cal., for appellants.

George W. Towle, of San Francisco, Cal., for appellees.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

ROSS, Circuit Judge. These cases were argued and submitted together. They are libels against the respective ships mentioned for alleged pilotage services. Both cases are alike, except that in that against the ship Umatilla a question is raised as to the sufficiency of the tender of the services sued for.

The cases were submitted upon an agreed statement of facts, from which it appears that the libelant in each case was at all the times mentioned in the libel a duly licensed pilot of the port of San Francisco, holding a license from the United States local inspectors of steamships, and also one from the California state board of pilot commissioners, of the port of San Francisco; that the libelant in the case of the Queen tendered to the master of that steamship, as she was entering the port of San Francisco on the 14th day of August, 1905, his services as a pilot, which services were refused; that the steamer Queen was at the time a duly registered American vessel, and was then com-

pleting a voyage from an American port on Puget Sound to the port of San Francisco, via Victoria, British Columbia, and for some time prior thereto had been engaged in making voyages between the port of San Francisco and American ports on Puget Sound, and that on each and every of such voyages the port of Victoria, British Columbia, was a regular port of call, being the first port of call on each voyage outward from San Francisco, and the last port of call on each voyage toward San Francisco from the American ports on Puget Sound; that the steamship Umatilla was at all of the times mentioned in the libel against that ship a duly registered American vessel, engaged in making similar voyages, and, being about to sail on her regular voyage from San Francisco to the port of Puget Sound, the libelant in that case tendered to the master of the ship "his, said Jordan's, services as a pilot so licensed, to pilot said Umatilla on her then voyage out of said port of San Francisco, by going on board said vessel alongside the wharf to which said steamship was then made fast, and not more than one hour before she was to and did sail on her voyage therefrom, and then and there orally stating to said master that he, said Jordan, was then and there ready and able and willing to so pilot said vessel, and that he, said Jordan, then desired that he be so employed."

The agreed statement shows these further facts:

"(4) That each of said vessels in said several libels mentioned was at all of the times in said libels and schedules referred to or mentioned a duly registered American steam vessel, and was at all said times sailing under 'register,' and each of said vessels at each of the several times in said several libels and schedules referred to was either on a voyage from the port of San Francisco in the state of California to a United States port on Puget Sound, or from a United States port on Puget Sound to said port of San Francisco, but in either such case said vessel did while en route between said ports in the United States stop at the port of Victoria, B. C., to and from which said port of Victoria she did then carry, and did then and there deliver and receive both passengers, mail, and freight; and on each and every voyage the port of Victoria, B. C., was a regular port of call, being the first port of call or stop on each voyage outward from San Francisco, Cal., and the last port of call or stop on each voyage toward San Francisco, Cal. Each and every one of the ships in this agreement mentioned on sailing outward bound from the port of San Francisco on her said voyage above described displayed at her foremast head the English flag, which indicated, according to the usage and custom of vessels and their navigators, that she was destined to a port under the dominion of Great Britain, whose merchant flag was so as aforesaid displayed at her foremast head, and similarly on each and every said inward voyage above described each and every one of the vessels in this agreement mentioned displayed the English flag on her foremast head, to indicate that she had come direct from a port under the dominion of that country.

"(5) That each of the masters and first officers of each of said vessels at all of the times in said several libels and schedules referred to was duly licensed under the laws of the United States of America to act as and serve as master and as pilot of any American steam vessel in entering and in departing from the said port of San Francisco, and all of the engineers and other officers of each of said vessels who under the laws of the United States needed then to be licensed were then duly licensed officers thereof; and each of said masters, during the two years next prior to any of the times in said libels referred to, had many times safely, and without the assistance of any pilot licensed under authority of the state of California, navigated and piloted vessels under his command then sailing under 'register,' and of the

class of those in said libels and said schedules referred to, out of and into said port of San Francisco.

"(6) That no master of any vessel owned or employed by either of said claimants, and sailing under 'register,' had ever, during the 20 and more years next prior to any of the times in said libels referred to, accepted the services of any of said libelants, nor of any state licensed pilot, to pilot any such vessel out of or into said port of San Francisco; and during all of the times herein last referred to each of said libelants and all state licensed pilots well knew that their services as pilots licensed by the state of California to so pilot any such vessel would not, if tendered, be availed of or accepted by either or any of the masters of such vessel, or by either or by any of said claimants.

"(7) That each and every and all of the said vessels in said several libels or in any schedule hereto attached referred to was long prior to any of the times in said several libels or schedules referred to well known to each and every and all of said libelants, and to all state licensed pilots of the said port of San Francisco. That said several vessels sailed from and arrived at San Francisco on a regular schedule, and could be and were by each and all of said libelants, and all state licensed pilots, identified and known in approaching the port of San Francisco long before he or any pilot needed or in the ordinary course of his business, would make any effort to 'speak' the same, if such vessel were by him thought to be in need of a pilot.

"(8) That, when the present state pilotage regulations of the port of San Francisco were under consideration by the Legislature of the state of California, the state licensed pilots of said port appeared before each of the committees of said Legislature having such matters in charge, and then by themselves and by their representatives were heard in connection with such regulations, and were likewise so heard by the Governor of said state before the act of the Legislature fixing such regulations, as now embodied in certain sections of the Political Code, was approved by him; and the fact long before then had been, and then was, and since then has been, and still is, that the only steam vessels that had been or were engaged in the coasting trade, touching en route at a foreign port, and sailing under 'register' out of or into the said port of San Francisco, were such of the vessels of said claimants, to wit, Pacific Coast Steamship Company, or the Pacific Company, as had been and were so employed."

The answer in each case set up that the steamship referred to in it during all the times mentioned was a duly registered steam vessel of the United States, and then was and during many months prior thereto had been continuously employed in the carriage of persons and property between the port of San Francisco, Cal., and the ports of Port Townsend, Seattle, Tacoma, Everett, Anacortes, South Bellingham, and Bellingham, all in the state of Washington, and in like business when returning to San Francisco; that during all of said times the said ship was a coastwise steam vessel of the United States then engaged in interstate coastwise commerce and transportation, and during all of said times was under the command of a master who then held a pilot's license or certificate that had been theretofore duly and regularly issued to him by the proper and competent authorities of the United States, and which said pilot's license authorized the said master under the pilot laws of the United States to pilot any and all enrolled or registered steam vessels of the United States, including the steamship in question, into and out of the port of San Francisco, and that the chief officer of the said steamship also held during all of the said times a similar pilot's license, which said licenses were then in full force, and that all the engineers of the said steamship were duly and regularly licensed by the proper United States authorities as re-

quired by the United States statutes, which licenses were in full force, and that each of the several officers of said ship had taken the oath of office prescribed by statute; that the said ship on its regular voyages between the port of San Francisco and the Puget Sound ports of the United States touched .en route. at the port of British Columbia, and there received on board passengers and freight for carriage there-on, the stop and stay of the ship at Victoria for such purpose being about one hour only, which stop the ship was authorized to make by the clearances granted at the United States custom house; that the 'number of passengers and the amount of freight taken on board at Victoria were insignificant as compared with the number of passengers and amount of freight taken on board at the American ports mentioned and transported by the steamship to and from the said American ports.

The record in each case shows that the services sued for were never in fact rendered, and that the acceptance of the proffered services was expressly refused by the respective steamships. The cases were certified by this court to the Supreme Court, where it was distinctly adjudged (225 U. S. 187, 32 Sup. Ct. 626, 56 L. Ed. 1047) that registered coastwise seagoing steam vessels are not required by any federal law to have a United States pilot in entering or leaving any state port, and that, even if any such vessel should have on board a pilot holding a federal license when entering or leaving such port, the regulation of such port pilotage is still subject to the laws of the state. The state laws, so far as applicable to the present controversy, are found in sections 2429, 2457, 2431, 2458, 2437, 2432, 2466, and 2468 of the Political Code of California, which, so far as necessary to be stated, are as follows:

"Sec. 2429. Qualifications of Pilots.—No person must be appointed a pilot unless he is an American citizen, over the age of twenty-one years, with a practical knowledge of the management of sailing vessels and steamboats, and of the tides, soundings, bearings, and distances of the several shoals, bars, rocks, points of land, lighthouses, and fog signals of the ports and harbors for which he is appointed, of a good moral character, and temperate, with the skill and ability necessary to discharge the duties of pilot."

"Sec. 2457. Commissioners to Examine and License Pilots.—The board of commissioners must examine and license, in the manner prescribed, not less than fifteen nor more than twenty pilots for the port of San Francisco, and not more than two pilots for the ports of Mare Island, Vallejo and Benicia."

"Sec. 2431. Pilots to Take Official Oath and Give Bond.—Every pilot must execute an official bond in the sum of five thousand dollars, to be approved by the officer or board appointing him. The bonds of pilots appointed by commissioners must be filed with such commissioners."

"Sec. 2458. Pilots to Keep Boats.—Pilots must at all times keep, for their exclusive use, boats of such description and good condition as directed by the board."

"Sec. 2437. Further Duties of Pilots.—When cruising off or standing out to sea, pilots must go to a vessel nearest to shore, or in the most distress, under a penalty of one hundred dollars; for refusing to go on board a vessel when required, a like penalty of one hundred dollars may be imposed; in either case, upon conviction, the pilot may be suspended or expelled, at the discretion of the commissioners."

"Sec. 2432. Vessel, Owner, etc., Liable for Pilotage.—All vessels, their tackle, apparel, and furniture, and the master and owners thereof, are jointly

and severally liable for pilotage fees, to be recovered in any court of competent jurisdiction."

"Sec. 2466. Rates of Pilotage at San Francisco.—The following shall be the rates of pilotage into and out of the harbor of San Francisco: All vessels under five hundred (500) tons three ($3.00) dollars per foot draught; all vessels over five hundred (500) tons three ($3.00) dollars per foot draught and three (3c) cents per ton for each and every ton registered measurement; and every vessel spoken inward or outward bound except as hereinafter provided shall pay the said rates. A vessel is spoken by day by a pilot boat displaying a union jack or by night displaying a torch or flare-up within a distance of three (3) miles of the vessel. ✶ ✶ ✶ "

"Sec. 2468. Exemption and Reduction of Pilotage.—All vessels sailing under an enrollment, and licensed and engaged in the coasting trade between the port of San Francisco and any other port of the United States shall be exempt from all pilotage unless a pilot be actually employed. All foreign vessels and all vessels from a foreign port or bound thereto, and all vessels sailing under a register between the port of San Francisco and any other port of the United States shall be liable for pilotage as provided in section twenty-four hundred and sixty-six of this Code."

[1] As has been stated, the only distinction between the two cases is that while the Umatilla was moored to the wharf, about to sail on her voyage out of the port of San Francisco, and within an hour of her sailing time, the libelant went on board and orally stated to her master that he was then and there ready, and able, and willing to pilot the vessel out of the harbor, and desired to be employed to do so, which services the master declined, concerning which the point is made that the tender of such service was without validity by reason of the provisions of section 2466 of the Political Code of California above quoted, and, further, that the vessel must be under way before a tender can be made. We see no merit in the point. In respect to the latter suggestion, in harbors where the tides are swift and the currents uncertain, it may well be that the greatest need of a pilot is when the vessel begins to move. The statute says that "every vessel spoken inward or outward bound," except as thereinafter specified, shall pay the prescribed rates, and adds that:

"A vessel is spoken by day by a pilot boat by displaying a union jack, or by night displaying a torch or flare-up within a distance of three miles of the vessel."

It would, we think, be absurd to hold that the pilot must take his boat out three miles from where the vessel to be piloted is moored and "speak" by displaying a union jack if in the day, or a torch or flare-up if at night. Equally untenable, we think, is the contention that an oral tender by the pilot to the master is insufficient. It is more certain, distinct, and reliable than the provisions of the statute as to how a vessel shall be spoken by a pilot boat, which may be and generally is some distance from the vessel to be piloted. There is therefore no substantial distinction between the two cases under consideration, in respect to both of which counsel for the appellee further contends that the decrees appealed from may yet be affirmed on two grounds: First, for the reason, as is claimed, that the California statute does not create a maritime lien upon the vessel to which the services are tendered; and, secondly, that the pilotage statute of the state imposes a duty or tax on tonnage for its own use, and is therefore invalid.

[2] In respect to the first of these contentions, the California statute prescribes, as has been seen, that:

"All vessels, their tackle, apparel, and furniture, and the master and owners thereof, are jointly and severally liable for pilotage fees, to be recovered in any court of competent jurisdiction." Section 2432, supra.

Not only are the master and owner thereby expressly made liable for such fees, but also the vessels themselves, their tackle, apparel, and furniture, jointly and severally. Section 2466 of the same Code prescribes the rates of pilotage into and out of the harbor of San Francisco, and expressly declares that "every vessel spoken inward or outward bound," with certain specific exceptions within which the present cases do not come, shall pay such rates; and by section 2468 of the same Code it is, among other things, expressly provided that:

"All vessels sailing under a register between the port of San Francisco and any other port of the United States shall be liable for pilotage as provided in section twenty-four hundred and sixty-six of this Code."

In the face of such explicit declarations of the statute, making such vessels as are here in question, their tackle, apparel, and furniture, liable for the prescribed charges and enforceable in a court of competent jurisdiction, we have no hesitation in holding that such charges are a lien upon such vessels, the appropriate court for the enforcement of which is a court of admiralty.

In the case of Steamship Company v. Joliffe, 2 Wall. 450, 17 L. Ed. 805, the Supreme Court had under consideration a statute of California passed May 20, 1861 (St. 1861, p. 594), entitled "An act to establish pilots and pilot regulations for the port of San Francisco," which statute was practically the same (so far as the question here involved is concerned) as the statute upon which the present cases are based, except that by that statute the charge for pilotage where the tendered service was not accepted was fixed at one-half, whereas, under the present statute, the charge is the same whether or not the tender is accepted. In the course of its opinion the court said:

"The claim to half-pilotage fees, it is true, was given by the statute, but only in consideration of services tendered. The object of the regulations established by the statute was to create a body of hardy and skillful seamen, thoroughly acquainted with the harbor, to pilot vessels seeking to enter or depart from the port, and thus give security to life and property exposed to the dangers of a difficult navigation. This object would be in a great degree defeated if the selection of a pilot were left to the option of the master of the vessel, or the exertions of a pilot to reach the vessel in order to tender his services were without any remuneration. The experience of all commercial states has shown the necessity, in order to create and maintain an efficient class of pilots, of providing compensation, not only when the services tendered are accepted by the master of the vessel, but also when they are declined. If the services are accepted, a contract is created between the master or owner of the vessel and the pilot, the terms of which, it is true, are fixed by the statute; but the transaction is not less a contract on that account. If the services tendered are declined, the half fees allowed are by way of compensation for the exertions and labor made by the pilot, and the expenses and risks incurred by him in placing himself in a position to render the services, which, in the majority of cases, would be required. The transaction in this latter case between the pilot and the master or owners cannot be strictly termed a contract, but it is a transaction to which the law

attaches similar consequences; it is a quasi contract. The absence of assent on the part of the master or owner of the vessel does not change the case. In that large class of transactions designated in the law as implied contracts, the assent or convention which is an essential ingredient of an actual contract is often wanting. Thus, if a party obtain the money of another by mistake, it is his duty to refund it, not from any agreement on his part, but from the general obligation to do justice which rests upon all persons. In such case the party makes no promise on the subject; but the law, 'consulting the interests of morality,' implies one; and the liability thus arising is said to be a liability upon an implied contract. The claim for half-pilotage fees stands upon substantially similar grounds."

That was a suit at common law, but the subsequent case of Ex parte McNiel, 13 Wall. 236, 20 L. Ed. 624, was an application for a writ of prohibition to the District Court to prevent the enforcement of a judgment in favor of the libelant for half-pilotage under a New York statute, where his services were tendered and refused, on the ground that the District Court had no jurisdiction of the cause of action stated in the libel, and that no lien existed on the vessel enforceable in a court of admiralty. Among other things, the Supreme Court said:

"It must be admitted that pilot regulations are regulations of commerce. A pilot is as much a part of the commercial marine as the hull of the ship and the helm by which it is guided; and half-pilotage, as it is called, is a necessary and usual part of every system of such provisions. Pilots are a meritorious class, and the service in which they are engaged is one of great importance to the public. It is frequently full of hardship, and sometimes of peril; night and day, in winter and summer, in tempest and calm, they must be present at their proper places, and ready to perform the duties of their vocation. They are thus shut out for the time being from more lucrative pursuits and confined to a single field of employment. * * * The precise question we are considering came before this court in Cooley v. Board of Wardens of the City of Philadelphia [12 How. 299, 13 L. Ed. 996]. The suit was for half-pilotage under a statute of Pennsylvania, substantially the same, in this particular, with the statute of New York. The plaintiff recovered in the lower court, and the Supreme Court of the state affirmed the judgment. The case was brought here for review by a writ of error under the 25th section of the Judiciary Act [Act Sept. 24, 1879, c. 20, 1 Stat. 85], and was argued with exhaustive learning and ability. This court, after the fullest consideration of the subject, also affirmed the judgment. We are entirely satisfied with that adjudication, and reaffirm the doctrines which it lays down. It is conclusive upon this branch of the case before us. The other objections taken to the judgment relate to the jurisdiction of the court. It is said there is no jurisdiction in admiralty to maintain a libel for a penalty. It was not a penalty that was recovered. There was a tender of services upon which the law raised an implied promise to pay the amount specified in the statute. Courts of admiralty have undoubted jurisdiction of all marine contracts and torts."

In the case of Ex parte Hagar, 104 U. S. 520, 26 L. Ed. 816, the same court denied an application for a writ of prohibition to restrain the District Court for the District of Delaware, sitting in admiralty, from proceeding further in a suit pending in that court against a vessel to recover the half-pilotage which was claimed to be due under the statutory provisions of Delaware (which were quite similar to those of California) for refusing to accept the services of a pilot when tendered, saying:

"It has long been well settled that claims for pilotage fees are within the jurisdiction of the admiralty."

See, also, Ex parte Pennsylvania, 109 U. S. 174, 3 Sup. Ct. 84, 27 L. Ed. 894.

Moreover, the Supreme Court by its rule 14 (29 Sup. Ct. xl) has provided that all suits for pilotage, without limitation as to the character of the service, may be brought in rem against the ship. It reads:

"In all suits for pilotage the libelant may proceed against the ship and master, or against the ship, or against the owner alone, or the master alone, in personam."

This rule allowing a suit in rem for pilotage is substantially like rule 19 (29 Sup. Ct. xli), allowing suits in rem for salvage, and as said by counsel for appellants, the readiness and tender of the pilot is not unlike that of the "standing by" of the salvor which entitles the salvor to an action in rem against the vessel. The Flottbec, 118 Fed. 954, 55 C. C. A. 448, and cases there cited.

In The Edith Godden (D. C.) 25 Fed. 511, Judge Brown, in considering the statute of New Jersey, said:

"Upon the merits * * * I think the pilot has sufficiently made out his claim in accordance with the statutes of New Jersey to be paid for his services, which were offered and rejected. The right to enforce such claims by libel in rem has been repeatedly sustained, even where the state statute did not in express terms make the vessel liable. The Glenearne [D. C.] 7 Fed. 604; The Lord Clive [D. C.] 10 Fed. 135. The Supreme Court in the cases of Steamship Co. v. Joliffe, 2 Wall. 450, 457 [17 L. Ed. 805], and of Ex parte McNiel, 13 Wall. 236, 242 [20 L. Ed. 624], has expressly declared that the obligation to pay these pilotage fees under state statutes, where the pilot's services are tendered and refused, is a liability upon a contract implied by the statute. Lowell, J., in the case of The America, 1 Low. 176 [Fed. Cas. No. 289], says: 'The suit is for an offer which the law makes equivalent to actual service.' Contract obligations in the navigation of the ship are enforceable in rem as well as in personam. These adjudications as to the nature of the obligation, made since the decision of Judge Betts and Judge Sprague in the cases of The George Law, 6 Amer. Law Reg. 368 [Fed. Cas. No. 8,223], and of The Robert J. Mercer, 1 Spr. 284 [Fed. Cas. No. 11,892], in effect overrule the decisions in the cases last named.

"In various other cases since, where writs of prohibition were refused by the Supreme Court, the proceedings were in rem. Ex parte Hagar, 104 U. S. 520 [26 L. Ed. 816]; Ex parte Pennsylvania, 109 U. S. 174, 3 Sup. Ct. 84 [27 L. Ed. 894]. In view of the nature of the obligation as adjudged by the Supreme Court, namely, an implied contract made in the course of the navigation of the ship, it is immaterial whether the state statute in terms gives a lien on the ship or not. From the fact that the obligation is one of contract, the admiralty has jurisdiction to enforce the obligation by any appropriate form whether in rem or in personam. Ex parte McNiel, 13 Wall. 243 [20 L. Ed. 624]; The George S. Wright, Deady, 591 [Fed. Cas. No. 5,340]; The California, 1 Sawy. 463, 467 [Fed. Cas. No. 2,312]; The William Law [D. C.] 14 Fed. 792. Rule 14 of the Supreme Court in admiralty expressly authorizes a proceeding in rem for pilotage; and if, as Judge Lowell says, the offer of pilotage is by statute made equivalent to actual service, then this rule would seem to be an express authority for a suit in rem."

Many other cases in which suits in rem against the vessel have been maintained for pilotage, where the tender of service has been refused might be cited, among them The Glenearne (D. C.) 7 Fed. 604; The George S. Wright, Fed. Cas. No. 5,340; The America, Fed. Cas. No. 289; The Alameda (C. C.) 32 Fed. 331; The Australia (D. C.) 36 Fed. 332; Weldt v. Howden (D. C.) 39 Fed. 877; Freeman v. The

Undaunted (C. C.) 37 Fed. 662; The Earnwell, 70 Fed. 331, 17 C. C. A. 136; The Carrie L. Tyler, 106 Fed. 422, 45 C. C. A. 374, 54 L. R. A. 236.

[3] The objection of counsel to the validity of the pilotage statute in question proceeds upon the theory that the 5 per cent. of the pilotage charge required by the statute to be paid by the pilots to the pilot commissioners is a duty or tax on tonnage with which to pay the state's indebtedness. We do not so understand it. The present state statute created, as did the act of May 20, 1861, under consideration in Steamship Company v. Joliffe, supra, a board of pilot commissioners authorized to license pilots and to prescribe their qualifications, duties, and compensation. The commission is, and then was, an essential part of the pilotage establishment expressly recognized by Congress in section 4235 of the Revised Statutes (U. S. Comp. St. 1901, p. 2903), which reads:

"Until further provision is made by Congress, all pilots in the bays, inlets, rivers, harbors, and ports of the United States shall continue to be regulated in conformity with the existing laws of the states respectively wherein such pilots may be, or with such laws as the states may respectively enact for the purpose."

Under the California act of 1861, the commissioners were allowed 10 per cent. of the fees collected by the pilots (Stats. 1861, p. 594); under the present act they are allowed 5 per cent. of such fees. The act of 1861 was adjudged valid by the Supreme Court in the Joliffe Case, notwithstanding its constitutionality was questioned, although apparently not on this precise ground. But in Huse v. Glover, 119 U. S. 543, 549, 7 Sup. Ct. 313, 316 (30 L. Ed. 487), the Supreme Court distinctly held that:

"A duty on tonnage within the meaning of the Constitution is a charge upon a vessel, according to its tonnage, as an instrument of commerce, for entering or leaving a port, or navigating the public waters of the country; and the prohibition was designed to prevent the states from imposing hindrances of this kind to commerce carried on by vessels."

It results from what has been said that in each case the judgment of the court below must be and hereby is reversed, and the cause remanded, with directions to enter judgment for the libelant with costs.