**UNITED STATES of America,**
**Appellant,**

v.

**Arthur R. KINTNER and Alyce**
**Kintner, Appellees.**

No. 13731.

United States Court of Appeals
Ninth Circuit.

Oct. 14, 1954.

H. Brian Holland, Asst. Atty. Gen., Ellis N. Slack, Harry Baum and Melva M. Graney, Sp. Assts. to the Atty. Gen., Dalton Pierson, U. S. Atty., R. Lewis Brown, Jr., Asst., Butte, Montana, for appellant.

Russell E. Smith, W. T. Boone, Jack W. Rimel, Missoula, Mont., for appellee.

Before ORR and CHAMBERS, Circuit Judges, and YANKWICH, District Judge.

YANKWICH, District Judge.

This is an appeal from the Judgment of the District Court of Montana, 107 F. Supp. 976, in favor of the appellees, who were the plaintiffs below, in an action to recover amounts paid as deficiency assessments on their income tax for the year 1948. The amount involved is rather small,—$780.13 plus interest. But the questions involved are of great importance. The plaintiffs are husband and wife, the wife being made a party because joint returns were filed. We shall refer to the husband as "the taxpayer".

The taxpayer is a doctor of medicine practicing his profession in Missoula, Montana. For many years prior to June 30, 1948, he was a member of a co-partnership which practiced medicine under the firm name of Western Montana Clinic. On that day the partners dissolved the partnership and executed "Articles of

Association" whereby they sought to become members of an unincorporated association to be known as the "Association" for the practice of medicine under the prior name. The assets and liabilities of the partnership were taken over by the Association which continued to carry on its activities. All but two of the employees of the partnership became employees of the Association.

The Articles of Association provided that the members "associate themselves together for the practice of medicine and surgery as an unincorporated association", which was to be endowed with the "attributes of a corporation" and to be "treated as a corporation for the purposes of taxation". The Association was to terminate upon the death of the last survivor of the original members. The original "members" of the Association were the eight doctors who had been the members of the partnership, and only physicians or surgeons duly licensed to practice medicine in Montana were eligible for admission to membership. The business of the Association was to be managed by an Executive Committee composed of five of the members who were to select the officers. Any indebtedness incurred by the Association through the act of a member without authority conferred by the Committee was chargeable against such member's share of the earnings of the Association. *Only the members were to be liable to third parties for professional misconduct.* They were to receive "salaries fixed by the Executive Committee. The net earnings of the Association were to be divided among them "in proportion to the salaries of such members", and "all sums paid to members * * * by way of distribution of net earnings shall be deemed to constitute compensation to the Members for services rendered during the year."

The Association was to collect "the accounts receivable for professional services rendered" by the members, was to furnish them with the equipment needed to render such services, and was to pay "all necessary expenses incident to the practice of medicine and surgery by its

Members". Instead of receiving an interest in the assets of the Association, each member agreed that upon his death or withdrawal, he would accept the benefits of a pension plan, the cost of which was to be borne by the Association. The death or retirement of a member was not to result in a dissolution of the Association, and the interest of a member was "non-assignable".

The Association enabled *some* rather than *all* the former partners to manage its affairs. The new form avoided the necessity of reorganization upon the death of a member. Since its formation the Association has operated in accordance with the Articles of Association. Its affairs have been managed by an Executive Committee composed of some of the members and officers chosen by the Committee have handled other details of management. The taxpayer was elected its president. The Association *rented* space for use in the practice of medicine; *employed* the services of nonmember doctors and other employees; *collected* the fees earned for medical services rendered by its members and other doctors employed by it; and *paid* them salaries and expenses incurred in practicing their profession. *It also paid social security and withholding taxes, for which purposes it included among its employees the member-doctors; and it paid federal incorporate income taxes and state corporation license taxes.*

The Articles of Association provided for the establishment of a pension plan for the benefit of "qualified employees", whereby those who had been employed by the Association or the partnership for at least three years and had attained the age of at least thirty years, became entitled to retirement benefits. Upon its formation, the Association entered into a pension trust agreement with a trustee-bank. This agreement provided, with respect to eligibility requirements, that employees of the Association who were "employees or members" of the predecessor partnership "shall be given credit for such period of membership or employment by such predecessor". All

contributions under the pension plan are made by the Association and not by the participants.

During the portion of the tax year 1948, beginning on July 1, 1948, the Association had thirty-eight employees, including as "employees" the eight member-doctors who were the members of the partnership. Of these, twenty-four (not including the member-doctors) were ineligible to participate under the terms of the pension plan because they had been employed less than three years, and three others were ineligible because of the age requirements. Of the remaining eleven persons who participated in the plan, eight were the member-doctors. For the purpose of determining whether they had been employed by the Association for at least three years, the period during which they had been members of the partnership was treated as *a period of employment*. Only three persons who were not members of the Association participated in the plan.

The Association set up a "reserve" fund on its books during 1948 to cover anticipated operating expenses for future years. If the Association is to be regarded for federal income-tax purposes as a partnership rather than a corporation, a share of this reserve amounting to $1,140.82 is includible in taxpayer's income for the tax year 1948.

The Association also made contributions to the pension trust during 1948, of which $976.14 was paid for the taxpayer's benefit. The taxpayer did not report either of these amounts in his 1948 tax returns. The Commissioner added them to his income and made a deficiency determination. The taxpayer paid the deficiency, and after his claim for refund was not acted upon within the period required by law, he instituted this action for refund. Internal Revenue Code, 26 U.S.C. § 3772(a).

The District Court found that the Association was to be treated as a corporation rather than a partnership, and that the taxpayer's share of the reserve fund set aside by the Association was not taxable to him. It also held that the trust met the exemption requirements of Section 165(a) of the Internal Revenue Code, 26 U.S.C. § 165(a), and that the amount paid to the trust by the Association was not taxable to him. Judgment for refund was entered on October 9, 1952, in favor of the taxpayer. The Government appeals.

## I

### Association or Partnership?

The first question to determine is whether the Association is to be treated as a corporation for tax purposes. The trial court so held in full Findings. Its opinion is reported in Kintner v. United States, D.C.Mont., 1952, 107 F.Supp. 976. Reliance was placed on Morrissey v. Commissioner, 1935, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263, in making this determination. The Court was especially impressed by what it called "[Criterion No. 3], termination or interruption by the death or withdrawal of owners". 107 F.Supp. at pages 979–980.

It is the Government's contention that the decision is erroneous in that the practice of medicine is personal, and that a corporation cannot engage in such practice. As a general rule, a corporation cannot practice medicine. 41 Am.Jur., Physicians and Surgeons, Sec. 20; People by Kerner v. United Medical Services, 1936, 362 Ill. 442, 200 N.E. 157, 103 A.L.R. 1229; State ex rel. Beck v. Goldman Jewelry Co., 1935, 142 Kan. 881, 51 P.2d 995, 102 A.L.R. 334.

The laws of Montana do not include the practice of medicine as one of the purposes for which a corporation may be organized. Montana Civil Code, 1935, Sec. 5902. And it may be assumed that its courts would infer from this statute an intention to prohibit a corporation from practicing medicine. The Government relies on the decision of the Court of Appeals for the Fifth Circuit in Mobile Bar Pilots' Association v. Commissioner, 5 Cir., 1938, 97 F.2d 695. The Court there held that because of the personal nature of a pilot's services, an association of pilots could not be classified as a corporation. There is a decision of

the Court of Appeals for the Seventh Circuit holding that a clinic organized for the practice of medicine was an "association" and taxable as such despite the fact that the state in which it was organized (Illinois) did not permit a corporation to practice medicine: Pelton v. Commissioner, 7 Cir., 1936, 82 F.2d 473. There the Commissioner was making contentions contrary to those which he is making here. The two-fold answer which the Court gave to the contentions of the taxpayer there is worth reproducing. The Court said:

"It is obvious from this record that petitioners' enterprise was carried on for profit, and it is likewise clear that all the substantial points of resemblance to a corporation as specified in the decisions mentioned were present in their organization. On the other hand, substantial dissimilarities to the partnership form appear. Petitioners have called our attention to a recent decision of the Illinois Supreme Court, People [by Kerner] v. United Medical Service, 362 Ill. 442, 200 N.E. 157, in which it was held that a corporation may not practice medicine in Illinois. However, we think that Article 1503 of Regulations 65 and 69 sufficiently covers this situation in providing that ' * * * organizations * * * are * * * associations within the meaning of the statute even though under state law such organizations are technically partnerships.' " 82 F.2d 476.

So it is evident that the Court was satisfied, as the trial court was in the case before us, that (1) the association had more of the criteria of a corporation, and (2) that this being so, the status of the Association under state law should be disregarded under the Bureau's own regulations.

The Government's contention as to the slight advantage involved in (1) centralized control by a small number, (2) continuity, and (3) limitation of liability, is also answered by the Supreme Court in the companion case to Morrissey v. Commissioner, supra. We refer to Helvering v. Combs, 1935, 296 U.S. 365, 56 S. Ct. 287, 288, 80 L.Ed. 275, in which the Court said:

"The beneficiaries did not hold a meeting and the trust had no office or place of business, no seal, bylaws, or official name, and the operations of the trustees were confined to the one lease they acquired. In considering whether an association was created, the fact that the beneficiaries did not exercise control is not determinative. Hecht v. Malley, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949; Morrissey v. Commissioner, supra. * * * Here, through the medium of a trust the parties secured centralized management of their enterprise, and its continuity during the trust term without termination or interruption by death or changes in the ownership of interests, and with limited liability and transferable beneficial interests evidenced by certificates. Entering into a joint undertaking they avoided the characteristic responsibilities of partners and secured advantages analogous to those which pertain to corporate organization. The fact that meetings were not held or that particular forms of corporate procedure were absent is not controlling. Morrissey v. Commissioner, supra."

And see, Helvering v. Coleman-Gilbert, 1935, 296 U.S. 369, 374, 56 S.Ct. 285, 80 L.Ed. 278.

The Pelton case has been cited with approval repeatedly by the courts. See, Wholesaler's Adjustment Co. v. C. I. R., 8 Cir., 1937, 88 F.2d 156; C. I. R. v. Highlands Evanston Lincolnwood Subdivision, 7 Cir., 1937, 88 F.2d 355. It was also cited by the Tax Court in a recent case: Giant Auto Parts, Ltd. v. C. I. R., 1949, 13 T.C. 307, 318.

The fact that some measure of control might have been secured by the partner-

ship does not override the advantages resulting from continuity, centralized control and limitation of liability. The Government's contention, based upon the proposition that because, under local law, a corporation is not allowed to practice medicine, the group is not an association, would introduce an element of uncertainty which neither the courts nor the regulations have recognized. Groups which could not engage in certain activities under State law because of their particular structure, or were considered partnerships have been recognized as legitimate "associations" partaking of corporate character for taxing purposes under federal law. See, Hecht v. Malley, 1924, 265 U.S. 144, 44 S.Ct. 462, 68 L.Ed. 949 (Massachusetts trusts); Burk-Waggoner Oil Ass'n v. Hopkins, 1925, 269 U.S. 110, 46 S.Ct. 48, 70 L.Ed. 183 (unincorporated joint stock companies); Commissioner of Internal Revenue v. Fortney Oil Co., 6 Cir., 1942, 125 F.2d 995 (unincorporated joint stock association); Tyrrell v. Commissioner, 5 Cir., 1937, 91 F.2d 500 (trust association).

The Government's contention here goes counter not only to the policy of the Internal Revenue Department, which, at all times, declines to be bound by State law, but also to the latest Treasury regulation on the subject which reads:

"The term 'association' is not used in the Internal Revenue Code in any narrow or technical sense. It includes any organization, created for the transaction of designated affairs, or the attainment of some object, which, like a corporation, continues notwithstanding that its members or participants change, and the affairs of which, like corporate affairs, are conducted by a single individual, a committee, a board, or some other group, acting in a representative capacity. It is immaterial whether such organization is created by an agreement, a declaration of trust, a statute, or otherwise. Regulation 111, Sec. 29.3797–2, 26 Code of Federal Regulations, 1949 Ed., p. 6553.

The section on partnerships provides in part:

" * * * If an organization is not interrupted by the death of a member or by a change in ownership of a participating interest during the agreed period of its existence, and its management is centralized in one or more persons in their representative capacities, such an organization is an association, taxable as a corporation." Regulation 111, Sec. 29.3797–4, 26 Code of Federal Regulations, 1949 Ed., p. 6555.

What precedes shows that the Pelton case is grounded soundly in the law and regulations relating to federal taxation. Because of these facts and the added fact that its logic appeals to us, we choose to follow it. The decision in Mobile Bar Pilots Ass'n v. C. I. R., 5 Cir., 1938, 97 F.2d 695, does not go counter to the position we have adopted, even if we assume that the regulations under which it was decided are the same as those in force now. Pilotage is a personal service which the pilot renders to the owner of the vessel, who is responsible to third parties for his negligence or lack of skill. Indeed, this court has held that the pilot has a maritime lien on the vessel for pilotage. The Queen, 9 Cir., 1913, 206 F. 148. The Court in the Mobile Bar Pilots Ass'n case, supra, referred to this decision, upon this very point and called attention to the fact that the association was not responsible to anyone for a pilot's acts. The crux of the decision lies in this brief paragraph:

"It would be impossible for petitioner to engage in the business of piloting as an independent contractor. Petitioner does no business except as an agent of its individual members. It owns no property and has no income as an entity. Consequently is not required to pay income taxes as an association." 97 F.2d at page 697.

So it is evident that this decision is based upon the limited services which the

association rendered to the pilots. By contrast, the Montana doctors are employed by the Association which receives the fees for services rendered by them to patients. It owns the equipment and apparatus necessary for the practice of medicine. The hours and the working conditions of the doctors are fixed by the Association, as is also their vacation time. The compensation they receive comes *not from the patients,* but *from the salaries* paid to them by the Association and a certain percentage of the profits in accordance with the agreement.

Although the Articles of Association disclaim liability to others for the negligence or lack of skill of the doctors, the Association which contracts with the patients and receives his fees would be responsible direct to the patient, even assuming that under the law of joint tort-feasors the doctors also might be held liable. For, in the last analysis, the patient deals with doctor and clinic. The authorities recognize joint and several liability resulting from the concurrent practice of medicine, whether in association, partnership or otherwise. 41 Am.Jur., Physicians and Surgeons, Sec. 113; Bolles v. Kinton, 1928, 83 Colo. 147, 263 P. 26, 56 A.L.R. 814; See, Giusti v. C. H. Weston Co., 1941, 165 Or. 525, 108 P.2d 1010, in which a hospital association, incorporated for profit, which employed physicians and furnished them office space and paid them monthly salaries, was held jointly liable for malpractice with one of the physicians. And see, Ybarra v. Spangard, 1944, 25 Cal.2d 486, 154 P. 2d 687, 690, 162 A.L.R. 1258, for a broad statement of the responsibility of all who treat or assist in treating a patient, regardless of legal relationship. It follows that the non-liability clause does not stand in the way of considering the association before us a corporation rather than a partnership for federal income tax purposes. Unlike the Mobile Bar Pilots Association, which owned no property and was required to pay no taxes, this Association paid the Social Security and Withholding Taxes required by law. So there is ample ground for differentiating the Association considered in the Pilots case from the Association before us.[1] And there is no conflict between that decision and the conclusion which the trial court arrived at here and which we approve.

It should be added that it would introduce an anarchic element in federal taxation if we determined the nature of associations by State criteria rather than by special criteria sanctioned by the tax law, the regulations and the courts. It would destroy the uniformity so essential to a federal tax system,—a uniformity which calls for equal treatment of taxpayers, no matter in what State their activities are carried on. For it would mean that tax incidences as to taxpayers in the same category would be determined differently according to the law of the State of residence.[2]

---

1. The Association here has a being of its own which transcends mere "agency" for the individual doctors. See, Maryland & Virginia Milk Producers Ass'n v. District of Columbia, 1941, 73 App.D.C. 399, 119 F.2d 787, 791–792; American Medical Ass'n v. United States, 1943, 317 U.S. 519, 528, 63 S.Ct. 326, 87 L.Ed. 434.

2. "The exertion of that power (to tax income) is not subject to state control. It is the will of Congress which controls, and the expression of its will in legislation, in the absence of language evidencing a different purpose, is to be interpreted so as to give a uniform application to a nationwide scheme of taxation. See, Weiss v. Wiener, 279 U.S. 333, 337,

49 S.Ct. 337, 73 L.Ed. 720; Burk-Waggoner Oil Ass'n v. Hopkins, 269 U.S. 110, 46 S.Ct. 48, 70 L.Ed. 183; United States v. Childs, 266 U.S. 304, 309, 45 S.Ct. 110, 69 L.Ed. 299. State law may control only when the federal taxing act, by express language or necessary implication, makes its own operation dependent upon state law." Burnet v. Harmel, 1932, 287 U.S. 103, 110, 53 S.Ct. 74, 77, 77 L.Ed. 199.

"The fact that under state law the organizations are not legal entities, that they do not hold title to property, and that they may constitute a tenancy in common is not controlling." Commissioner of Internal Rev. v. Fortney Oil Co., etc., 6 Cir., 1942, 125 F.2d 995, 998.

## II

### The Validity of Pension Trusts

The second point urged is that the pension trust does not meet the exemption requirements of Section 165 of the Internal Revenue Code, 26 U.S.C. § 165. The provision is rather lengthy and is printed in the margin.[3]

The taxpayer concedes that the Association is probably a partnership un-

3. "(b) Taxability of beneficiary. The amount actually distributed or made available to any distributee by any such trust shall be taxable to him in the year in which so distributed or made available, under section 22(b) (2) as if it were an annuity the consideration for which is the amounts contributed by the employee, except that if the total distributions payable with respect to any employee are paid to the distributee within one taxable year of the distributee on account of the employee's separation from the service, the amount of such distribution to the extent exceeding the amount contributed by the employee, shall be considered a gain from the sale or exchange of a capital asset held for more than 6 months. Where such total distributions include securities of the employer corporation, there shall be excluded from such excess the net unrealized appreciation attributable to that part of the total distributions which consists of the securities of the employer corporation so distributed. The amount of such net unrealized appreciation and the resulting adjustments to basis of the securities of the employer corporation so distributed shall be determined in accordance with regulations which shall be prescribed by the Secretary. For purposes of this subsection, the term 'securities' means only shares of stock and bonds or debentures issued by a corporation with interest coupons or in registered form, and the term 'securities of the employer corporation' includes securities of a parent or subsidiary corporation (as defined in section 130A (d) (2) and (3)) of the employer corporation. In no event shall the amount actually distributed or made available to any distributee include net unrealized appreciation in securities of the employer corporation attributable to the amount contributed by the employee. Such net unrealized appreciation and the resulting adjustments to basis of such securities shall also be determined in accordance with regulations which shall be prescribed by the Secretary. * * *

"(d) Certain employees' annuities. Notwithstanding subsection (c) or any other provision of this chapter, a contribution to a trust by an employer shall not be included in the income of the employee in the year in which the contribution is made if——

"(1) such contribution is to be applied by the trustee for the purchase of annuity contracts for the benefit of such employee;

"(2) such contribution is made to the trustee pursuant to a written agreement entered into prior to October 21, 1942, between the employer and the trustee, or between the employer and the employee; and

"(3) under the terms of the trust agreement the employee is not entitled during his lifetime, except with the consent of the trustee, to any payments under annuity contracts purchased by the trustee other than annuity payments.

"The amount so contributed by the employer shall not constitute consideration paid by the employee for such annuity contract in determining the amount of annuity payments required to be included in his gross income under section 22(b) (2); except that if the tax imposed by this chapter for any taxable year beginning before January 1, 1949, has been paid by the employee with respect to such contribution for such year, and not credited or refunded, the amount so contributed for such year shall constitute consideration paid by the employee for such annuity contract. This subsection shall have no application with respect to amounts contributed to a trust after June 1, 1949, if the trust on such date was exempt under subsection (a). For the purposes of this subsection, amounts paid by an employer for the purchase of annuity contracts which are transferred to the trustee shall be deemed to be contributions made to a trust or trustee and contributions applied by the trustee for the purchase of annuity contracts; the term 'annuity contracts purchased by the trustee' shall include annuity contracts so purchased by the employer and transferred to the trustee; and the term 'employee' shall include only a person who was in the employ of the employer, and was covered by the agreement referred to in paragraph (2), prior to October 21, 1942. As amended Oct. 25, 1949, c. 720, § 5(a), 63 Stat. 893; Oct. 20, 1951, 2:07 p. m., E.S.T., c. 521, Title III, § 335 (a), 65 Stat. 507; July 17, 1952, c. 942, § 1, 66 Stat. 766."

der Montana state law. It is also conceded that, if it is a partnership, *for federal tax purposes,* the exemption of the funds does not apply. The conclusion announced upon that point disposes of the contention on that ground. However, the Government asserts other grounds of invalidity against the pension plan. Before considering them, we advert to the fact that the object of this Section, which originated in the Statute of 1942, was to make, through tax-exemptions, pension or bonus plan benefits available to employees rather than to a few favored high-salaried executives. The Court of Appeals for the Second Circuit has summed up, from legislative history, the scope of this Section in this language:

"That Act was primarily designed 'to insure that stock bonus, pension, or profit-sharing plans are operated for the welfare of employees in general, and to prevent the trust device from being used for the benefit of shareholders, officials, or highly-paid employees,' and to insure that 'it shall be impossible for any part of the corpus or income to be used for purposes other than the exclusive benefit of the employees.'" Tavannes Watch Co. v. C. I. R., 2 Cir., 1949, 176 F.2d 211, 216.

■■■ These premised, we consider the Findings of the trial court as to the conditions of the trust established here, and the objections of the Government, bearing in mind the presumed correctness of Findings, unless clearly erroneous. Rule 52(a), Federal Rules of Civil Procedure, 28 U.S.C.A.; 26 U.S.C.A. § 1141.

The Court found that neither the pension committee nor the trustee had the power to divert the trust. It may be conceded that a fund which gives to the beneficiaries no vested interest and in which the power to divert or to liquidate the trust exists at the will of a trustee or group of trustees does not satisfy the requirements of Section 165. South Texas Commercial National Bank of Houston v. C. I. R., 5 Cir., 1947, 162 F. 2d 462; Chas. E. Smith & Sons Co. v. C. I. R., 6 Cir., 1950, 184 F.2d 1011; Lichter v. C. I. R., 6 Cir., 1952, 201 F.2d 49. However, the Court here found specifically that there was no power either in the trustee or in the pension committee to achieve such diversion or liquidation. An analysis of the Association Agreement shows clearly that the trial court correctly interpreted the instrument. The pension committee supervised the operation of the retirement plan in accordance *with the terms of the plan.* It is given power to authorize only such disbursement by the trustee *as the trust authorizes.* And, while it is given power to control the investment of funds, the investment is limited to insurance and retirement annuity contracts, or, as otherwise provided in the trust. The pension committee, while free from liability for exercising their duties, are held responsible for willful misconduct. The record discloses that the investment actually made for the beneficiaries of the plan was in the form of an annuity in a legal reserve life insurance company. The contract provides specifically that the annuity plan is for the exclusive benefit of the employees:

"(a) The Retirement Plan herein created is for the exclusive benefit of the employees who are entitled to qualify hereunder and become Participants hereunder in the manner set forth herein. *Notwithstanding anything to the contrary elsewhere in this Agreement,* or in any instrument or revocation, alteration, amendment, modification or suspension hereof contained, (or in this Agreement or any instrument implied) under no circumstances or conditions whatsoever shall any contribution by the Association to the Pension Trust hereby established or to or for any purpose hereunder, or any other cash, rights, titles, interest, privileges or benefits in any way whatsoever arising under this Agreement, *ever revert to the possession, ownership or control of or revest in the Association or in any manner whatsoever directly or indi-*

*rectly inure to the benefit of any of the Association.*" (Italics supplied.)

The rights of the employees in the annuity contracts are non-transferable and non-assignable:

"It is expressly provided that title to all such contracts and policies and to investment securities and other funds and properties held in connection with the Retirement Plan shall be vested in the *Trustee, subject to rights of the employees, which are unassignable and non-transferable except as expressly authorized by this agreement.*" (Italics supplied.)

There is no power in the Association to deprive a participant of his right to receive the benefit of the plan. The instrument says so specifically:

"The Association, however, shall not have the right to amend this agreement in any way which will *deprive any Participant of this trust of the right to receive the then benefits under a policy issued under this agreement, or which will alter the basic purpose of this agreement, or which will give the Association any rights in funds contributed to this trust,* or in any assets of this trust, or which will, without the consent of the Trustee, change the duties or responsibilities of the Trustee." (Italics supplied.)

The right to control investments under the limitations of the trust could not, by any stretch of the imagination, be interpreted as a power to divert funds. Indeed, it would be hard to find any trust declaration which does not give control of investments to someone. So the argument in this respect lacks substance.

Nor is there merit to the contention that there is discrimination because employees must serve three years before they can benefit and certain doctor members, who had been members of the partnership, are given credit for the period during which they were employed by the partnership. A *working* partner is employed about the business of the partnership. One of the dictionary definitions of the word "employee" is

"To engage, have or keep for or in service or in duty; procure or retain the services of; set or keep at work." Funk & Wagnalls, New Standard Dictionary.

■ By requiring new employees to have a minimum of three years service, the object was to achieve *equality. And equality is equity.* Had doctors who had worked for the partnership not been given the benefit of their prior service, there would be discrimination *against them.* The Tax Court has held that a provision of this character which makes allowance for prior service is not discriminatory, saying:

"Under the plan as amended, all present regular full-time employees and all future employees, upon completion of two years of service, are included as beneficiaries. The plan, therefore, meets the requirements contained in subdivision 3(A) of Section 165(a). Therefore, the plan meets all the requirements of section 165(a) of the code as amended." Volckening, Inc., v. Commissioner, 1949, 13 T.C. 723, 729.

The reasoning of this decision was adopted by the Court of Appeals for the Sixth Circuit in H. S. D. Co. v. Kavanagh, 1951, 191 F.2d 831, 843. There a different ratio of benefits was provided for two stockholders owning 97 per cent of the stock. The Court held that this did not imply discrimination, saying:

"A formula by which two stockholders owning 97% of the stock of a tax-paying corporation, received the benefit of more than 50% of the contributions made to an employees' trust, was held by the Tax Court not to be in violation of the requirements of Section 165(a) of the Internal Revenue Code, as amended, since the contributions bore a uniform relationship to the regular rate of compensation, the reasonableness of which the government did not question. Volckening, Inc., v.

**428**

Commissioner, 13 T.C. 723. In Betty C. Stockvis, T.C.Memo., Op.Dkt. 20316, January 25, 1951, where the Commissioner contended that a pension trust was not exempt on the ground that it discriminated in favor of supervisory and highly compensated employees, the Tax Court held that the larger contributions made on behalf of the company's managers, on the basis of their larger salaries, did not result in the plan being discriminatory in favor of such managers. In the instant case, there was no discrimination as to any of the contributions or investments in either of the trusts, subsequent to the amendments of 1942."[4]

In the instant case the object is to give the benefit of the trust to employees who had served three years. This was a promise of additional benefits dependent on a minimum of three years service to induce long-term associations with the clinic. As the eight doctors who had been members of the partnership had already contributed their service to the partnership, it would have been unfair to them not to give them the benefit of the tenure they had already had.

■■■ In dealing with a contract made for the benefit of those who are engaged in a common enterprise, the aim of which is to encourage tenure, we should give to ordinary words the same liberal construction we give to legislation conferring social benefits. The doctors had contributed to whatever good will the partnership brought to the Association. In a sense, as working partners, they were employees. See Rutherford Food Corp. v. McComb, 1947, 331 U.S. 722, 730, 67 S.Ct. 1473, 91 L.Ed. 1772. But whether they were such or not, in a strict sense, they could be placed in the same category with other employees for the

purpose of the plan and the three-year prior period could be resorted to for the purpose of placing them on the same footing with those who came later into the "vineyard". Mathew, 20:1–15.

We conclude that the trial court was right in holding that the Association was, for federal tax purposes, a corporation and that the pension plan satisfied all the requirements of Section 165 of the Internal Revenue Code.

The judgment is affirmed.

question is a practical one, dependent upon experience. The demand for symmetry ignores the specific difference that experience is supposed to have shown to mark the class." 232 U.S. at page 144, 34 S.Ct. at page 282.

---

4. Long ago, Mr. Justice Holmes insisted that in the matter of classification "a lack of abstract symmetry does not matter". Patsone v. Com. of Pennsylvania, 1914, 232 U.S. 138, 144, 34 S.Ct. 281, 282, 58 L.Ed. 539. He added: "The