## Medical Partnership Associations

M. J. DEAN, Deputy Attorney General; H. N. SHEN-
KIN, Deputy Attorney General, and D. STAHL, Attor-
ney General, September 27, 1961.—You have requested
our opinion as to whether a group of physicians may
associate in the practice of medicine in a partnership
association under the Act of June 2, 1874, P. L. 271,
as amended, 59 PS §§341 et seq., and thus be able to
qualify for Federal corporate income tax treatment.
This inquiry is pertinent because of certain Federal
court decisions [1] holding that an association of physi-
cians having various corporate characteristics may be
considered a corporation for Federal income tax pur-
poses.[2]

The relevant facts are as follows:

The Internal Revenue Code of 1954 accords differ-

---

[1] United States v. Kintner, 216 F. 2d 418 (9th Cir., 1954); Galt
v. United State of America, 175 F. Supp. 360 (N. D. Tex., 1959).

[2] The practice of medicine has become increasingly complex and
specialized and its tools increasingly expensive. In the face of such
changes, it is apparent that in order to assure patients of adequate
modern medical treatment many phyicians will deem it desirable
to pool their specialized talents and funds by forming medical
groups. Time Magazine, July 1, 1961, pages 56-60. Despite the
public value of group practice, its sporadic development in the
eastern part of our country contrasts sharply with its rapid growth
elsewhere.

Recent Federal tax decisions and interpretive Internal Revenue
Service regulations may persuade eastern practitioners to adopt
the prevailing pattern. Combinations of not more than 10 prac-
titioners are in a position to gain the greatest tax advantage. Such
a combination would find in these decisions the authority to be
treated as a corporation for purposes of deducting certain items
of expense. In addition, under subchapter S of the Internal Reve-
nue Code, such an organization might then elect to have its in-
come taxed on a partnership rather than corporate basis so as to
avoid the customary double taxation of corporate income—first at
the corporate and then at the stockholder level.

ent tax treatment to corporations, partnerships and trusts. However, the code defines the "corporation" classification to include not only the artificial entities known under State law as corporations but also the broader categories of "associations and joint-stock companies."[3]

The code does not provide any express definition of the term "association." Nevertheless, it was obvious to the courts and the Internal Revenue Service that if the basic threefold classification of the code was to be preserved, this term could not be deemed to embrace organizations which were clearly of a partnership or trust nature. Consequently, the test that evolved for determining association status was whether or not the organization in question resembled the corporation more than it did either of the other business forms.[4]

Regulations recently adopted by the Internal Revenue Service[5] have greatly simplified this resemblance rule by reducing it to a more quantitative test. These regulations provide that an unincorporated organization may be classified as an association if such organization has a majority of those characteristics which are normally possessed by a pure corporation but not by a partnership.[6] The regulations enumerate these distinguishing corporate characteristics as: continuity of life, free transferability of interest, limited liability of members, and centralization of management.

We are informed that a number of associations of physicians have recently been organized under the

---

[3] Section 7701(a)3, Internal Revenue Code.

[4] Morrissey v. Commissioner of Internal Revenue, 296 U. S. 344, 56 S. Ct. 289, 80 L. Ed. 262 (1935).

[5] These regulations were published as Treasury Decision 6503, 26 C. F. R. §§301.7701-1 to 301.7701-11, *C C H Standard Federal Tax Reporter*, vol. 6, par. 5942. They have become known as the "Kintner" regulations, the name of the leading case in the field.

[6] 26 C. F. R. §301.7701-2(a)(3).

Partnership Association Act of June 2, 1874. Subsequent to your request for an opinion, the legislature enacted the Professional Association Act (Act No. 416), approved by the Governor on August 7, 1961, also providing for the formation of professional associations for purposes similar to those contemplated in your inquiry.

The basic questions to which this opinion directs itself are:

1. In addition to the availability of the 1961 statute, may a number of physicians join together in the practice of their profession and utilize for this purpose the provisions of the Partnership Association Act of June 2, 1874?

2. If so, does the Medical Practice Act of June 3, 1911, P. L. 639, as amended, 63 PS §§401 et seq., prohibit the existence of such an association having a majority of the following corporate characteristics: continuity of life, free transferability of interest, limited liability of members, and centralization of management?

It should be noted that Act No. 416 of 1961 was specially designed to permit the formation of professional associations. This act permits professional persons to associate in a special form of organization, having certain corporate characteristics, for the practice of their professions. The act specifically provides that such an association may have continuity of life, centralized management and limited transferability of interest. However, section 17 of the act makes professional associates liable, jointly and severally, for the torts of any agent or employe of the association committed in the ordinary course of operation of the association, or for the misapplication of money or property by an associate. All associates are jointly liable for other debts of the association. Thus, the limited liability characteristic available under the

1874 law is completely absent in associations organized under Act No. 416.

I. *May a Number of Physicians Join Together in the Practice of Their Profession, and Utilize for This Purpose the Provisions of the Partnership Association Act of 1874?*

The Partnership Association Act of June 2, 1874, was preceded by the enactment of the Corporations Act of April 29, 1874, P. L. 73. The Corporations Act of 1874 enumerated 20 purposes for which second class corporations, or corporations for profit, could be formed. By necessary implication, it excluded all businesses and occupations not specifically listed.

In contrast, section 1[7] of the Partnership Association Act of 1874 authorized the formation of associations "for the purpose of conducting *any* lawful business or occupation . . . " It does not make specific inclusions and implied exclusions by an enumeration of the purposes for which such associations may be formed. To determine the scope of this provision, therefore, it is necessary to examine the meaning of the language "business or occupation." (Italics supplied).

It cannot be assumed that the term "occupation," as used in the act is mere surplusage. On the contrary, it must have been intended to include those fields of endeavor not generally considered or classified as business. Historically, "business" connotes " . . . Mercantile pursuit or transactions; trade; commerce; as, he prefers *business* to law . . . A commercial or industrial enterprise . . . "[8]

"Occupation" is defined as "That which principally takes up one's time, thought and energies; especially, one's regular business or employment; also what-

---

[7] 59 PS §341.

[8] Webster's New Collegiate Dictionary (1959).

ever one follows as the means of making a liveli-
hood . . . Particular business, *profession*, trade, or
calling which engages individual's time and efforts,
employment in which one regularly engages or voca-
tion of his life . . . " (Italics supplied).[9]

Under an act which is substantially similar to the
Partnership Association Act of 1874, the Ohio At-
torney General has used this same definitional ap-
proach in construing the term "occupation" as in-
cluding the practice of a profession.[10]

Accordingly, the Partnership Association Act would
authorize physicians to practice their profession
through the medium of an association organized under
its provisions.

II. *Does the Medical Practice Act Prohibit the Ex-
istence of Such an Association Having a Majority of
the Following Corporate Characteristics: Continuity of
Life, Free Transferability of Interest, Limited Lia-
bility of Members, and Centralization of Manage-
ment?*

Before considering this question, it is necessary
to inquire whether an association of physicians under
the 1874 Act, having all or a majority of the es-
sentially corporate characteristics of continuous life,
centralized management, limited liability and free
transferability of interest, could itself be considered
engaged in the practice of medicine for the purposes
of the Medical Practice Act. Obviously, an entity
which cannot comply with the necessary educational
and character requirements cannot itself be licensed
to practice medicine.

A partnership association formed under the 1874
Act may, in its own name, hold and convey real estate,

---

[9] Black, Law Dictionary (4th ed., 1951).

[10] See opinion, Ohio Attorney General, no. 2050 (March 10,
1961).

and sue and be sued (Act of June 2, 1874, as amended, 59 PS §361); may exist for perpetually renewable 20-year periods (59 PS §441); has centralized management (59 PS §401); its members have limited liability (59 PS §381), and the interests of its members may be transferred: 59 PS §383. Such an association is clearly a separate juridical entity, similar to a corporation.[11]

It is an established doctrine that a corporation cannot practice medicine: People ex rel. State Board of Medical Examiners v. Pacific Health Corporation, Inc., 12 Cal. 2d 156, 82 P. 2d 429 (1938), and cases there cited. See Neill v. Gimbel Brothers, Inc., 330 Pa. 213, 199 Atl. 178 (1938). But the cases in which a corporation has been held to be practicing a profession illegally involved corporations formed for profit and controlled by laymen. The courts emphasize the divided loyalty and impairment of professional confidence in such cases. Thus, in the Pacific Health Corporation case, where a private corporation contracted with members of the public to furnish medical services in return for a premium, the California Supreme Court held the corporation was practicing medicine, saying (12 Cal. 2d at 158, 82 P. 2d, at 430):

"We are unable to agree that the policy of the law may be circumvented by technical distinctions in the manner in which the doctors are engaged, designated or compensated by the corporation. The evils of divided loyalty and impaired confidence would seem to be equally present whether the doctor received benefits from the corporation in the form of salary

---

[11] Whitney v. Backus, 149 Pa. 29, 34, 24 Atl. 51 (1893): ". . . Unlike an ordinary partnership, and like a corporation, it [a partnership association] is an artificial person, and survives the death of a member or a sale of his interest. . . ."

or fees. Any freedom of choice is destroyed, and the elements of solicitation of medical business and lay control of the profession are present whenever the corporation seeks such business from the general public and turns it over to a special group of doctors . . . ."

In the Gimbel case, a department store leased space to an optometrist. The lease provided that only the name of the department store be used for advertising, required the lessee to spend a certain amount for advertising under the lessor's direction, and provided for the lessor to share one-half of gross annual business over $50,000. The Pennsylvania Supreme Court, after finding optometry to be a profession, concluded that the optometrist, under these circumstances, was the department store's agent, and as the department store could not practice optometry, it could not do so through an agent.

An association of physicians under the 1874 Act, in order to be in accord with the Medical Practice Act of June 3, 1911, P. L. 639, as amended, necessarily has to be limited in membership to licensed physicians[12] who alone would direct the enterprise and share in the profits. The element of lay control would thus be completely absent, and there would be no impairment of the personal physician-patient relationship. The physician in such an association, as in the case of an individual practitioner, would be solely responsible for his own conduct, although the association may be responsible, to the extent of its assets, for the malpractice of any of its members. The association itself would not in any sense be engaged in professional activity and merely would be the vehicle

---

[12] It is our opinion that such an association should be limited in membership to physicians who actively practice their profession as association members, and that physicians should not be permitted to invest in such an association merely for business reasons.

utilized by the individual physicians for the practice of their profession.

Under these circumstances, we are of the opinion that the association could not be considered engaged in the practice of medicine.[13]

We turn then to the question of whether a partnership association having any of the so-called "corporate characteristics," or a majority of them, would be in violation of the Medical Practice Act of June 3, 1911, as amended. That act provides that the license of a physician may be revoked or suspended on various grounds, such as conviction of certain crimes, most of which are not relevant to our problem. The pertinent provision is found in section 12, 63 PS §410, which states that the Board of Medical Education and Licensure may " . . . refuse, revoke, or suspend the right to practice medicine . . . upon satisfactory proof of grossly unethical practice, or of any form of pretense which might induce citizens to become a prey to professional exploitation."

It is against this standard that the various "corporate characteristics" must be judged.

## 1. Continuity of Life

The Internal Revenue Service has by regulation provided that, for Federal tax purposes:

"An organization has continuity of life if the death, insanity, bankruptcy, retirement, resignation, or expulsion of any member will not cause a dissolution of the organization . . ."[14]

A partnership association under the Act of June 2, 1874, as amended, may have a duration of 20 years

---

[13] See Restateent of Agency 2d §19, comment d:

". . . If a statute requires the doer of an act to be licensed, ordinarily an unlicensed principal can properly employ a licensed agent to do it."

[14] 26 C. F. R. §301.7701-2(b)(1).

(59 PS §341), a period which is perpetually renewable: 59 PS §441. Although the act does not in so many words say that the death, etc., of a member shall not dissolve the association, this is the unmistakable import of its provisions.[15] A partnership interest is termed personalty which may be " . . . transferred, given, bequeathed, distributed, sold or assigned . . ." under such rules and regulations as the association may prescribe: 59 PS §383. In the absence of such rules, a transferee may not participate in subsequent association business unless properly elected to membership (id.) ". . . And any change of ownership, whether by sale, death, bankruptcy or otherwise . . . ," in the absence of rules regulating transfer and not followed by election to membership, entitles the owner or transferee only to the value of the interest on the date of acquisition: Id. Finally, the section on dissolution (59 PS §421), provides for only two methods thereof, viz. expiration of the fixed period, or upon a proper vote.

It is clear, therefore, that the partnership association may have, certainly with the adoption of proper rules and regulations, that continuity of life contemplated by the Federal tax authorities.

Does this continuous life feature violate any provision of the Medical Practice Act? There is no specific inhibition in that act against it, and we are aware of no ethical consideration which would proscribe it. We have seen that such an association of physicians may validly be organized under the 1874 Act; there is no reason why the association cannot continue indefinitely. It is assumed that the rules and regulations of the association would provide for the proper licensure of new members.

---

[15] See Whitney v. Backus, supra, where the Supreme Court states this proposition categorically (149 Pa., at 34).

## 2. *Free Transferability of Interest*

The Federal regulations provide that this element is only present if a member has the power to substitute for himself a person who is not a member of the organization (1) without the consent of the other members, and (2) confer on such other person all the attributes of his interest in the organization, including sharing of profits and participation in management: 26 C. F. R. §301.7701-2(e) (1).

This characteristic exists under the 1874 law in modified form, for, as indicated above, a transferee or devisee of a member's interest can only succeed to full membership upon being properly elected by the other members: 59 PS §383.[16]

As long as the rules and regulations of the physician's association provide that the transferee or devisee of the member's interest must be properly licensed,[17] the presence of this characteristic in no way transgresses the Medical Practice Act. The same factors prevail here as in the case of the continuous life of the association.

## 3. *Limited Liability*

In this respect, the Federal regulations provide:
"An organization has the corporate characteristic of limited liability if under local law there is no member who is personally liable for the debts of or claims against the organization . . ." [18]

The Act of June 2, 1874, specifically includes this limited liability characteristic: 59 PS §381:
"The members of any such partnership association

---

[16] This restricted type of transferability is termed a "modified corporate characteristic" by the Federal regulations, entitled to some weight in classifying the organization as a corporation. See 26 C. F. R. §301.7701-2(e) (g).

[17] See footnote 12, supra.

[18] 26 C. F. R. §301.7701-2(d) (1).

shall not be liable under any judgment, decree or order which shall be obtained against such association, or for any debt or engagement of such company, . . ." An exception is made to the extent of subscriptions to capital not paid up; this is purely a matter of contract law and does not affect the limited liability feature.

Furthermore, our courts have made it clear that members of a partnership association are not liable for tortious acts of the association or of other members in which they did not participate. Whitney v. Backus, supra.

The limited liability of a member in a partnership association of physicians presents no problem under the Medical Practice Act. The physician-member is liable to the patient he treats for malpractice just as if he were engaged in practice individually. The member is subject to the same legal and ethical standards as a private practitioner, and the personal nature of the physician-patient relationship is in no way altered. The fact that the member does not incur additional liability as a partnership associate is of no moment as far as the Medical Practice Act of June 3, 1911, is concerned.

### 4. Centralization of Management

The Federal regulations provide:

"An organization has centralized management if any person (or any group of persons which does not include all the members) has continuing exclusive authority to make the management decisions necessary to the conduct of the business for which the organization was formed . . ." [19]

Subsequent sections provide that the managers need not be members, and that the characteristic of cen-

---

[19] 26 C. F. R. §301.7701-2(c)(1).

tralized management does not exist if the authority of the managers is merely ministerial in nature.[20]

The Act of June 2, 1874 is adequate in this regard. It provides for the election by the members of the partnership association of a board of managers of not less than three nor more than nine (59 PS §§401, 402). The association shall not be liable for any debt unless contracted for by one or more managers; any liability over $500 must be in writing and signed by at least two managers: 59 PS §401.

Such managers would clearly have the power, in the case of an association of physicians, to make all necessary *business* decisions, including the purchase and sale of real estate or office equipment, and the hiring of employes. In order to satisfy the requirements of the Medical Practice Act, the bylaws of the association should explicitly provide that the managers have no authority to interfere with the professional relationship between any member and his patient or to influence the course of treatment. The managers could and perhaps should have authority, however, to require members to adhere to recognized professional and ethical standards.

The 1874 Act does not require that the managers be selected exclusively from the membership. However, we are of the opinion that in an association of physicians a majority of the managers must be member-physicians, and careful provision should be made that a lay manager have no authority in professional matters.

This type of centralized management, with authority limited to purely business matters and, perhaps, to enforcement of recognized professional and ethical standards, would not present any problem un-

---

[20] Ibid., (2) and (3).

der the Medical Practice Act of June 3, 1911, and would satisfy the Federal tax regulations.

As has been indicated, it is this department's opinion that the presence of any of the above four "corporate characteristics" in a partnership association of physicians does not in any way contravene the provisions of the Medical Practice Act. Nor do we see how the existence of all or a majority of such characteristics would have such a result. The essential relationship between physician and patient remains unchanged; the "characteristics" only have to do with the business method by which the services are rendered. In no way can this method be held, under section 12 of the Medical Practice Act of June 3, 1911, to constitute "grossly unethical practice" or "induce citizens to become a prey to professional exploitation." [21]

We are of the opinion, therefore, and you are accordingly advised, that (1) a group of physicians

---

[21] The passage of the Professional Association Act (Act No. 416 of 1961) is clear evidence that the legislature does not consider it ethically improper for physicians to practice in this form of "corporate" organization. Furthermore, on December 5, 1957, the American Medical Association House of Delegates adopted the following resolution:

"Whereas, it has been found by experience that physicians practicing as a partnership, association or as members of other lawful group arrangements can preserve the physician-patient relationship, insuring that medical responsibility lies in the hands of the patient's own doctor and not in the hands of an unlicensed person or entity; and

"Whereas the ethical principles of the A.M.A. apply to the individual physician whether he practices alone or with a group;

"Now therefore be it

"Resolved that the House of Delegates affirm that it is within the limits of ethical propriety for physicians to join together as partnerships, associations or other lawful groups provided that the ownership and management of the affairs thereof remain in the hands of licensed physicians."

may associate for the practice of medicine in a partnership association under the provisions of the Act of June 2, 1874, P. L. 271, as amended, 59 PS §§341 et seq., and (2) the fact that such an association would have continuity of life, free transferability of interest, limited liability of members, and centralization of management would not constitute a violation of the Medical Practice Act of June 3, 1911. Furthermore, with the limitations expressed in this opinion, the Professional Association Act (Act No. 416 of 1961), may also be used for the purpose indicated in your request.