**UNITED STATES of America,**
**Appellant,**

v.

**Lawrence G. EMPEY, Appellee.**

**No. 9814.**

United States Court of Appeals
Tenth Circuit.

Jan. 7, 1969.

Meyer Rothwacks, Atty., Dept. of Justice, and Lawrence M. Henry, U. S. Atty., of counsel (Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Lester B. Snyder and Howard J. Feldman, Attys., Dept. of Justice, on the briefs), for appellant.

Ellis J. Sobol, Denver, Colo. (Drexler & Wald, Denver, Colo., on the brief), for appellee.

Howard W. Rea and Davis, Graham & Stubbs, Denver, Colo., for Colorado Bar Assn. as amicus curiae.

John K. Speck, Joseph G. Rucks, E. W. Burch, Mervin E. Templin, Oklahoma City, Okl., J. B. Bratton, McAlester, Okl., Julian P. Kornfeld and Edwin Riffel, Oklahoma City, Okl., for Oklahoma Bar Assn. as amicus curiae.

Jule M. Hannaford and Dorsey, Marquart, Windhorst, West & Halladay, Minneapolis, Minn., for Medical Group Management Assn. as amicus curiae.

Frederick K. Cross and Felix G. Kancel, Jr., Kansas City, Kan., for Kansas Bar Assn. as amicus curiae.

Before PHILLIPS, HILL and SETH, Circuit Judges.

ORIE L. PHILLIPS, Circuit Judge.

Empey brought this action to recover a refund of federal income taxes paid for the year ending December 31, 1965. From a judgment for Empey, the United States has appealed.

The material facts are not in dispute.

On December 29, 1961, a corporation was created, pursuant to the general corporation laws of Colorado,[1] under the name Drexler, Wald, Sobol and Coffee Professional Company,[2] to carry on the practice of law.

Rule 265 of the Colorado Rules of Civil Procedure, effective December 5, 1961, (Colo.R.Civ.P. 265, 1965 Perm. Cum.Supp. to Colo.Rev.Stat.Ann.1963, pp. 27–29) authorizes lawyers to organize professional service corporations under the Colorado Corporation Code and thereafter operate them for the practice of law, provided they organize and operate such corporations in accordance with the provisions of such Rule.[3]

---

1. Colorado Corporation Code, 2 Colo.Rev. Stat.Ann.1963, Articles 1–10, inclusive.

2. Hereinafter called the Corporation.

3. The pertinent parts of such Rule read:
   "265. *Professional Service Corporations* * * *. Lawyers may form professional service corporations for the practice of law under the Colorado Corporation Code, providing that such corporations are organized and operated in accordance with the provisions of this Rule. The articles of incorporation of such corporations shall contain provisions complying with the following requirements:
   "A. The name of the corporation shall contain the words 'professional company' or 'professional corporation' or abbreviations thereof, * * *.
   "B. The corporation shall be organized solely for the purpose of conducting the practice of law only through persons qualified to practice law in the State of Colorado.
   "C. The corporation may exercise the powers and privileges conferred upon cor-

It will be observed that Rule 265 provides that the articles of incorporation of a professional service corporation formed for the practice of law "shall contain provisions complying with," *inter alia*, "the following requirements":

The corporation shall be organized solely for the purpose of carrying on the practice of law only through persons qualified to practice law in the State of Colorado;

The corporation may exercise the powers and privileges conferred on it by the Colorado corporation laws, only in furtherance of such purpose;

All shareholders shall be duly licensed to practice law in Colorado and actively engaged in the practice of law;

A shareholder who ceases to be eligible to hold shares in the corporation shall forthwith dispose of his stock, either to the corporation or to a person eligible to be a shareholder;

The shareholders shall be jointly and severally liable for all acts, errors and omissions of employees of the corporation, except during periods of time when the corporation maintains a lawyers' professional liability insurance policy meeting the requirements set forth in Paragraph G of Part I of such Rule.

At all times here material, the Corporation has carried professional liability insurance in full conformity with the provisions of Paragraph G of Part I of such Rule.

The Corporation was organized and thereafter operated in full compliance with Rule 265. The Corporation, its shareholders, and its lawyer employees in carrying on the practice of law through the Corporation have not violated the Canons of Professional Ethics applicable to lawyers.[4]

On January 3, 1962, the Corporation issued its stock, as follows: Drexler—30 shares, Wald—30 shares, Sobol—30 shares, Coffee—10 shares. The stock was issued in exchange for furniture, fixtures, equipment and cash. The amount of stock allotted each was based on his seniority status and the volume of his practice.

Prior to the creation of the Corporation, Sobol and Drexler were partners and Wald and Coffee were sole practitioners. However, they all occupied the same suite of offices.

porations by the laws of Colorado only in furtherance of and subject to its corporate purpose.

"D. All shareholders of the corporation shall be persons duly licensed by the Supreme Court of the State of Colorado to practice law in the State of Colorado, and who at all times own their shares in their own right. They shall be individuals who * * * are actively engaged in the practice of law in the offices of the corporation.

"E. Provisions shall be made requiring any shareholder who ceases to be eligible to be a shareholder to dispose of all his shares forthwith either to the corporation or to any person having the qualifications described in paragraph D above.

"F. The president shall be a shareholder and a director, and to the extent possible all other directors and officers shall be persons having the qualifications described in paragraph D above. * * *.

"G. The articles of incorporation shall provide and all shareholders of the corporation shall agree (a) that all shareholders of the corporation shall be jointly and severally liable for all acts, errors and omissions of the employees of the corporation, * * * except during periods of time when the corporation shall maintain in good standing lawyers' professional liability insurance which shall meet the following minimum standards:

"1. The insurance shall insure the corporation against liability imposed upon the corporation by law for damages resulting from any claim made against the corporation arising out of the performance of professional services for others by attorneys employed by the corporation in their capacities as lawyers.

"2. Such policy shall insure the corporation against liability imposed upon it by law for damages arising out of the acts, errors and omissions of all nonprofessional employees."

4. See Opinion 303 of American Bar Association's Committee on Professional Ethics, 48 A.B.A.J. 159 (1962).

Prior to October 3, 1962, Circular No. 230 of the United States Treasury Department[5] prohibited employees of professional service corporations from representing clients before such Department. On October 3, 1962, the circular was amended, so as to permit such employees to represent clients before the Treasury Department.[6]

Since the principal practice of the shareholders of the Corporation had to do with tax matters, it did not become active until after the promulgation of such amendment.

On November 1, 1962, the Corporation elected officers, adopted by-laws and a seal, and changed its corporate name to Drexler and Wald Professional Company. Wald and Drexler were elected president and vice-president, respectively, and remained such at all times here material. Sobol was elected treasurer and Coffee was elected secretary. In August 1963, the offices of treasurer and secretary were combined and Sobol became secretary-treasurer of the Corporation.. At all times here material, Drexler, Wald and Sobol have been the directors of the Corporation.

On November 1, 1962, the Corporation began the active practice of law and each shareholder entered into an employment contract with the Corporation, identical, except as to the amount of monthly salary. Nonshareholder lawyer employees entered into like contracts with the Corporation at the beginning of their employment with it. The salary of each employee was determined by taking the "norm of" his "prior years' earnings, * * * averaging it," and thereby arriving at a starting salary.

On November 1, 1962, the shareholders of the Corporation entered into a stock redemption contract, which provided, *inter alia:*

"2. *Retirement or Death.* Each shareholder, and his estate, shall have the option of selling all of his shares to the Professional Company at any time. On redemption of stock, the price of the shares which are surrendered to the Professional Company shall be, except as is provided in Paragraph 3 hereinbelow, the book value thereof as of the last day of the month preceding the month in which the redemption is made and the payment therefor shall be made in cash on receipt of shares. Since this corporation has no good will, book value shall include no good will. All shareholders of the corporation shall be persons duly licensed by the Supreme Court of the State of Colorado to practice law in the State of Colorado. They shall also be individuals who, except for time spent for illness, accident, time spent in the armed services, on vacations, and on leaves of absence not to exceed one year, are actively engaged in the practice of law in the offices of the corporation. All shares of any shareholder who ceases to be eligible to be a shareholder of this corporation shall be redeemed immediately in accordance with the provisions of this paragraph.

"3. *Free Transferability of Shares.* A shareholder may transfer all or any portion of his shares to any person qualified by the Articles of Incorporation to be a shareholder; provided, however, that the shareholder desiring to transfer all or any portion of his shares first shall advise the Professional Company of the proposed transfer and the price offered for the shares. Prior to any such sale, the Professional Company shall have the option to redeem the said shares at the same price offered by the proposed transferee. If said option is not exercised by the Professional Company within ten (10) days after notice to it of the proposed sale, the

5. 1962–2 C.B. 394, 31 C.F.R. § 10.4(d) (1959).

6. 1962–2 C.B. 394.

shareholder shall be free to sell his said shares to said transferee." [7]

The employment contracts referred to above contained provisions giving the Corporation substantial control over its lawyer employees' work, including the assigning of clients, fixing work deadlines, determining working hours, and reviewing and modifying work product.

Most of the Corporation's business comes to it by referrals from lawyers or accountants. Usually, the referrer sends his client's matter to a lawyer employee of the Corporation whom the referrer has used before, or with whom he is acquainted. Since to some extent the lawyer employees of the Corporation specialize in different fields of tax law, in a routine case the lawyer employee either decides he shall handle the matter himself, or if the matter falls within the specialty of another lawyer employee, decides to pass it on to the latter. However, if the case is unusual or not routine, it is usually referred to the board of directors, which selects the lawyer employee who shall handle the case.

Sometimes a matter is referred to the Corporation generally, and not to a particular lawyer employee. In such instances, if it is a routine case, it is assigned to a particular lawyer employee by Sobol, the office manager. If it is a matter that is unusual or not routine, the executive committee, composed of Wald and Sobol, determines to whom the matter shall be assigned. [8]

If the case is a routine one, the lawyer employee who handles it usually fixes the fee to be paid by the client, but if the case is a large one, or the person to whom the service is rendered is a "major client," the board of directors usually fixes the fee.

The board of directors fixes deadlines and guidelines, fixes working hours, and determines the amount of bonuses to be paid particular lawyer employees, based on the amount of income generated by the efforts of the lawyer employee. The board of directors also determines whether employment tendered by a particular client shall be rejected, because in their opinion the client is undesirable.

The Corporation has obtained short-term loans to provide working capital from time to time in its own name, without any shareholder endorsement, guaranty or liability. It has entered into a 10-year lease of its law offices at a basic annual rental in excess of $8,800, without individual guaranty or liability on the part of the shareholders.

The name of the Corporation appears on the letterhead of the stationery used by its officers and lawyer employees. The Corporation's name appears on its office doors, in the building directory, and in its listing in the Martindale-Hubbell Law Directory. It maintains a corporate bank account. In courts where so authorized, it signs pleadings in its corporate name. It has obtained an employer identification number from the Internal Revenue Service; has regularly filed employer-employee tax returns and paid the tax thereon; has made all corporate reports required by state or federal laws; and has filed corporate tax returns, both state and federal, and

---

7. The Articles of Incorporation in part provided:

"SECOND: The corporation shall have perpetual existence.

\*     \*     \*     \*     \*

"FOURTH: All shareholders of the corporation shall be persons duly licensed by the Supreme Court of the State of Colorado to practice law in the State of Colorado. They shall also be individuals who, except for time spent for illness, accident, time spent in the armed services, on vacations, and on leaves of absence not to exceed one year, are actively engaged in the

practice of law in the offices of the corporation. All shares of any shareholder who ceases to be eligible to be a shareholder of this corporation shall be called immediately in accordance with the provisions of Article FIFTH (c), or the ownership thereof shall otherwise immediately be vested in persons qualified to be shareholders."

8. A standard fee agreement entered into between the Corporation and its clients reserves the right of the Corporation to select the lawyer employee to handle the matter.

paid the taxes assessed thereon. It has established an employee profit sharing plan and trust and makes annual contributions thereto. It carries for its employees Blue Cross and Blue Shield insurance, health and accident insurance, and group life insurance. It also carries professional liability insurance. It has a large investment in books, office furniture, fixtures, and equipment. It holds stockholders' and directors' meetings.

In August 1963, Coffee left the employment of the Corporation and his stock was redeemed by the Corporation and held as treasury stock.

From January 1, 1965, to November 1, 1965, Empey was employed by the Corporation as a lawyer, but did not own any stock in the Corporation. On November 1, 1965, he became the owner of 10 shares, or 10 per cent of the outstanding stock of the Corporation. From November 1 to December 1, 1965, Empey continued to be a lawyer employee of the Corporation.

In his federal income tax return for the calendar year 1965, Empey reported the salary he received from the Corporation for the first 10 months of the year. In addition, Empey reported 10 per cent of the net income of the Corporation for the months of November and December, 1965, although he received no part of such income by way of dividend or otherwise.

Empey timely filed a claim for a refund of the tax paid by him on the difference between his salary for the months of November and December, 1965, and 10 per cent of the Corporation's net earnings for those months. On July 20, 1966, after the Commissioner had failed to take any action on the claim within six months after it was filed, Empey commenced this action.

The applicable provisions of the Internal Revenue Code of 1954 are found in 26 U.S.C.A. § 7701. The pertinent parts of that section read:

"§ 7701.  *Definitions*

"(a) When used in this title, where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

"(1)  *Person.*—The term 'person' shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

"(2)  *Partnership and partner.*—The term 'partnership' includes a syndicate, group, pool, joint venture, *or other unincorporated organization,* through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title, a trust or estate or a corporation; and the term 'partner' includes a member in such a syndicate, group, pool, joint venture, or organization.  (Italics ours.)

"(3)  *Corporation.*—The term 'corporation' includes associations, joint-stock companies, and insurance companies.

\*     \*     \*     \*     \*     \*

"(b)  *Includes and including.*—The terms 'includes' and 'including' when used in a definition contained in this title shall not be deemed to exclude other things otherwise within the meaning of the term defined."

The provisions of Treasury Regulations on Procedure and Administration (1954 Internal Revenue Code), §§ 301.-7701–1 and 301.7701–2, promulgated November 15, 1960, which are most pertinent in the instant case, are set forth in Note 9.[9]

9.  "§ 301.7701–1 *Classification of organizations for tax purposes.*

"(a) *Person.*  The term 'person' includes an individual, a corporation, a partnership, a trust or estate, a joint-stock company, an association, or a syndicate, group, pool, joint venture, or other unincorporated organization or group.  \* \* \*.

"(b) *Standards.*  The Internal Revenue Code prescribes certain categories, or classes, into which various organizations fall for purposes of taxation. These categories, or classes, include associations (which are taxable as corporations), partnerships, and trusts. The tests, or standards, which are to be applied in determin-

The pertinent parts of an amendment to § 301.7701–2, approved January 28, 1965, and published February 3, 1965, in 30 F.R. 1116, applicable to professional service organizations' taxable years, beginning after December 31, 1964, (§ 301.-7701–2(a) (5)) are set forth in Note 10.[10]

ing the classification in which an organization belongs (whether it is an association, a partnership, a trust, or other taxable entity) are determined under the Internal Revenue Code. Sections 301.-7701–2 to 301.7701–4 set forth these tests, or standards, which are to be applied in determining whether an organization is (1) an association (see § 301.7701–2), (2) a partnership (see § 301.7701–3), * * *.

\* \* \* \* \*

"§ 301.7701–2 *Associations.*

"(a) *Characteristics of corporations.* (1) The term 'association' refers to an organization whose characteristics require it to be classified for purposes of taxation as a corporation rather than as another type of organization such as a partnership or trust. There are a number of major characteristics ordinarily found in a pure corporation which, taken together, distinguish it from other organizations. These are: (i) Associates, (ii) an objective to carry on business and divide the gains therefrom, (iii) continuity of life, (iv) centralization of management, (v) liability for corporate debts limited to corporate property, and (vi) free transferability of interests. Whether a particular organization is to be classified as an association must be determined by taking into account the presence or absence of each of these corporate characteristics. The presence or absence of these characteristics will depend upon the facts in each individual case. In addition to the major characteristics set forth in this subparagraph, other factors may be found in some cases which may be significant in classifying an organization as an association, a partnership, or a trust. An organization will be treated as an association if the corporate characteristics are such that the organization more nearly resembles a corporation than a partnership or trust. See Morrissey et al. v. Commissioner (1935) 296 U.S. 344, [56 S.Ct. 289, 80 L.Ed. 263].

"(2) * * * Some of the major characteristics of a corporation * * * are common to partnerships and corporations. * * * since associates and an objective to carry on business and divide the gains therefrom are generally common to both corporations and partnerships, the determination of whether an organization which has such characteristics is to be treated for tax purposes as a partnership or as an association depends on whether there exists centralization of management, continuity of life, free transferability of interests and limited liability.

\* \* \* \* \*

"(4) The rules of this section and §§ 301.7701–3 and 301.7701–4 are applicable only to taxable years beginning after December 31, 1960. * * *."

10. "§ 301.7701–1 *Classification of organizations for tax purposes.*

\* \* \* \* \*

"(c) *Effect of local law.*—* * * a professional service organization, formed under the law of a State authorizing the formation by one or more persons of a so-called professional service corporation, would not be classified for purposes of taxation as a 'corporation' merely because the organization was so labeled under local law. See Morrissey et al. v. Commissioner, 296 U.S. 344, [56 S.Ct. 289, 80 L.Ed. 263] (1935). The classification in which a professional service organization belongs is determined under the tests and standards set forth in §§ 301.7701–2, 301.7701–3, and 301.7701–4. "§ 301.7701–2 *Associations, including organizations labeled 'corporations.'*

\* \* \* \* \*

"(h) *Classification of professional service organizations.*—(1) (i) A professional service organization is treated as a corporation (or as an association and, therefore, taxable as a corporation) only if it has sufficient corporate characteristics to be classifiable as a corporation under paragraph (a) of this section, rather than as a partnership or proprietorship. For purposes of determining the classification of an organization under these regulations, the term 'professional service organization,' as used in this paragraph, means an organization formed by one or more persons to engage in a business involving the performance of professional services for profit which under local law, may not be organized and operated in the form of an ordinary business corporation having the usual characteristics of such a corporation. Thus, even if a professional service organization is organized as an ordinary business corporation, this paragraph applies if such corporation is subject to local regulatory rules which deprive such

It is fairly obvious that the purpose of the amendment of January 28, 1965, was to prevent a professional service organization from being able to qualify as a corporation for tax purposes under the Internal Revenue Code.

The issue presented is whether the Corporation, for federal income tax purposes, should be classified and taxed as a corporation, as asserted by Empey, or as a partnership, as asserted by the United States. That question in turn involves the interpretation of § 7701(a) (2) and (3) of the Internal Revenue Code of 1954, which defines the terms "partnership" and "corporation" for federal income tax purposes, and Treasury Regulations 301.7701–1(1) and (2), promulgated thereunder on November 15, 1960, and, in particular, the validity of paragraph (h) of Treasury Regulation 301.-7701–2, approved January 28, 1965.

In the Internal Revenue Act of 1894, c. 349, 28 Stat. 509, 556, and in the several internal revenue acts since enacted by Congress, it has seen fit to treat corporations and partnerships differently for federal income tax purposes. The term "corporation" was first defined by

corporation of the usual characteristics of an ordinary business corporation. * * *.

\* \* \* \* \*

"(2) * * * A business corporation has a continuing identity as an entity which is not dependent upon a shareholder's active participation in any capacity in the production of the income of the corporation. Furthermore, the interest of a shareholder in an ordinary business corporation includes a right to share in the profits of the corporation, and such right is not legally dependent (determined without regard to any agreement among the shareholders) upon his participation in the production of the corporation's income. However, the interest of a member of a professional service organization generally is inextricably bound to the establishment and continuance of an employment relationship with the organization, and he cannot share in the profits of a professional service organization unless he also shares in the performance of the services rendered by the organization. For purposes of this paragraph, the term 'employment relationship' is used to describe such active participation by the member and is not restricted to the common-law meaning of such term. If local law [or] applicable regulations, * * * do not permit a member of a professional service organization to share in its profits unless an employment relationship exists between him and the organization, and if in such case, he or his estate is required to dispose of his interest in the organization if the employment relationship terminates, the continuing existence of the organization depends upon the willingness of its remaining members, if any, either to agree, by prior arrangement or at the time of such termination, to acquire his interest or to employ his proposed successor. * * *.

\* \* \* \* \*

"(5) (i) If the right of a member of a professional service organization to share in its profits is dependent upon the existence of an employment relationship between him and the organization, free transferability of interests within the meaning of paragraph (e) of this section exists only if the member, without the consent of other members, may transfer both the right to share in the profits of the organization and the right to an employment relationship with the organization.

"(ii) * * * if the interest of a member of a professional service organization constitutes a right to share in the profits of the organization which is contingent upon and inseparable from the member's continuing employment relationship with the organization, and the transfer of such interest is subject to a right of first refusal, such interest is subject to a power in the other members of the organization to determine not only the individuals whom the organization is to employ, but also who may share with them in the profits of the organization. The possession by other members of the power to determine, in connection with the transfer of such an interest, whom the organization is to employ is so substantial a hindrance upon the free transferability of interests in the organization that such power precludes the existence of a modified form of free transferability of interests. Therefore, if a member of a professional service organization who possesses such an interest may transfer his interest to a qualified person who is not a member of the organization only after having first offered his interest to the other members of the organization at its fair market value, the corporate characteristic of free transferability of interests does not exist."

Congress in the Internal Revenue Act of 1918, c. 18, 40 Stat. 1057, 1058. It defines a corporation as including "associations, joint-stock companies, and insurance companies." That Act did not define partnerships. It did define a "personal service corporation" as "a corporation whose income is to be ascribed primarily to the activities of the principal owners or stockholders who are themselves regularly engaged in the active conduct of the affairs of the corporation and in which capital * * * is not a material income-producing factor." (Revenue Act of 1918, c. 18, 40 Stat. 1057, 1059, § 200.) It provided that such corporations were to be treated as partnerships for income tax purposes. (Revenue Act of 1918, c. 18, 40 Stat. 1057, 1070, § 218(e).) However, that tax treatment was short-lived and it was eliminated by the Revenue Act of 1921, c. 136, 42 Stat. 227, 245, § 218(d).

Since 1921, Congress has not seen fit to provide different treatment for personal service corporations and other corporations, and it was not until 1965 that the Treasury Department attempted any such distinction.

The Revenue Act of 1932, c. 209, 47 Stat. 169, 289, § 1111, defined the term "partnership" substantially as it is defined in the Revenue Act of 1954. And since 1918 the term "corporation" and since 1932 the term "partnership" have been defined in successive Revenue Acts without substantial change, to and including the Internal Revenue Code of 1954.

The trial court held that the Regulations here involved are inconsistent with the statutory definition of corporations and partnerships and the judicial construction thereof, and constitute the exercise of a nondelegable legislative function and are therefore invalid and unenforceable.

The trial court further held that the Corporation more nearly resembled a corporation than a partnership, and even if the Regulations were valid, it would be entitled to be treated as a corporation for federal income tax purposes.

It will be observed that the statutory definition of the term "corporation" extends, rather than limits, the ordinary meaning thereof. It includes "associations, joint-stock companies, and insurance companies," as well as entities organized as corporations, while the statutory definition of the term "partnership" includes a "syndicate, group, pool, joint venture, or other *unincorporated organization*." (Italics ours.)

Prior to 1965, the Treasury Department consistently treated an entity chartered and operated in good faith as a corporation under state law, as a corporation for federal income tax purposes.[11]

Although classification as a corporation for federal income tax purposes generally results in additional income tax and possible tax disadvantages, it also can provide income tax advantages not otherwise available.[12] Thus, the employees of a corporation or an association may participate in a qualified pension and profit-sharing plan and any contribution by the employer thereto is not taxable to the employees when made, although it is deductible by the employer. Such benefits are not available to partners, because they are not employees.

In Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935), the petitioners, as trustees of an express trust, contested income taxes assessed for

---

11. Professional Corporations and Associations, 75 Harv.L.Rev. 756, 785 (1962); Anderson, Tax Aspects of Professional Corporations, U.S.C. 15th Tax Inst. 309, 320–322 (1963);
Bittker, Professional Associations and Federal Income Taxation, 17 Tax Law Rev. 1, 26 (1961), where the author said: " * * * until now all organizations bearing the label 'corporation' under state law have, without further inquiry, been accorded that status for federal income tax purposes, the only debate in this area having been concerned with the classification of organizations that are *not* labelled 'corporations' by state law."

12. Eaton, Professional Corporations and Associations in Perspective, 23 Tax Law Rev. 1, 22–23 (1967).

the years 1924–1926, inclusive. The question was whether the declaration of trust created a pure trust or an association for federal income tax purposes. In 1921, the petitioners executed a declaration of trust, transferring certain real estate described therein to designated trustees. In their collective capacity, the trustees were designated as "Western Avenue Golf Club." The trust instrument authorized the trustees to add to their number and choose their successors; to purchase, encumber, lease, or sell the described real estate or other lands; to construct and operate golf courses and club houses; to make loans and investments, and generally manage the trust estate as if the trustees were the absolute owners thereof. The trust instrument declared they were without power to bind the beneficiaries personally by "any act, neglect or default," and that persons dealing with the trust must look to the trust property for payment or indemnity. The beneficial interests in the trust were evidenced by transferable certificates, consisting of 2,000 shares of preferred stock of the par value of $100 each, and 2,000 shares of common stock of no par value.

The trust instrument provided that the death of a trustee or beneficiary should not end the trust, but that it should continue for 25 years. Beneficial interests were sold in 1921 and 1922.

About 42 acres of the 155 acres described in the trust instrument were subdivided into lots and sold in the years 1921 to 1923, mostly on installment contracts. On the remaining acreage, the trustees constructed a golf course and club house. In 1923, they transferred the golf course and club house to a California corporation in exchange for stock of the latter. They operated the golf course under lease until January 12, 1924. Thereafter, the activities of the trust were confined to collection of principal and interest on installment contracts for the purchase of lots, receipt of interest on bank balances, fees on assignment of installment contracts, making of conveyances to purchasers of lots, receipt of dividends on corporate stock, and distribution of money to owners of the beneficial interests.

The court held that the salient features of a trust, when created and maintained for carrying on a business enterprise and sharing in its gains, which may be regarded as making it analogous to a corporation are: Holding title to the property as an entity; trustees as a continuing body with provisions for succession; nontermination of the enterprise by reason of the death of the owners; transferability "of beneficial interests without affecting the continuity of the enterprise"; limitation of personal liability of the shareholders by vesting complete control in the trustees.

It will be observed that the court, in referring to transferability of beneficial interests, makes no reference to "free transferability," that is, without limitation as to who may purchase. Reference is made only to transfers "of beneficial interests without affecting the continuity of the enterprise."

The court concluded the trust was an association within the meaning of the applicable statutory definition [substantially the same as it is in the Internal Revenue Code of 1954] and taxable as a corporation. The court observed, however, that the statutory definition implies resemblance, saying, "it is resemblance and not identity."

In Pelton v. Commissioner, 7 Cir., 82 F.2d 473 (1936) the facts were these:

Between 1913 and 1920, Ora L. Pelton, Sr., and Ora L. Pelton, Jr., both of whom specialized in surgery, and S. L. Gabby, who specialized in internal medicine, practiced medicine at Elgin, Illinois. They occupied a suite of offices with a common waiting room.

On September 1, 1920, they entered into an indenture, by which they transferred to themselves as trustees property of an estimated value of $14,000, consisting of office furniture and equipment, instruments, laboratory equipment, x-ray devices and equipment, and a library.

Pelton, Jr., died in 1929, leaving Pelton, Sr., and Gabby as the surviving trustees.

The indenture authorized the trustees to use the property conveyed to them in any manner they deemed advisable, to operate clinics and any business or professional pursuit allied thereto, to retain any professional assistance needed to discharge such duties, including that of the trustees in a professional capacity, to incur indebtedness and to invest and reinvest in securities.

The indenture provided the trustees would receive for their services salaries not to exceed $25,000 per year; that they had the power to divide their duties and assume appropriate titles; that they would distribute the net income annually or oftener; that "they were not to be liable in a personal capacity for the duties performed by them"; that vacancies among the trustees should be filled by the beneficiaries; that the holders of 51 per cent of the beneficial interests should have the power to modify the trust; that the trust should be designated as "The Pelton Clinic," "The Pelton Clinic, not Inc.," or "The Pelton Clinic Trust"; that it should continue for 10 years, and that the assets should then be distributed to the beneficiaries of record.

At the beginning, Pelton, Sr., had a beneficial interest of 40 per cent, or 200 units; Pelton, Jr., had 35 per cent, or 175 units; and Gabby had 25 per cent, or 125 units.

Provision was made for the distribution, upon the death of a beneficial owner, to his wife or other relatives, of any units owned by him at the time of his death.

The beneficial interests were represented by shares which were transferable, but the other beneficiaries were to have the option to purchase them at $30 per share before they were sold to outsiders. By an amendment made by the beneficiaries of January 1, 1924, the price was changed from $30 per share to book value and provision was made for the retention of $10,000, or 75 per cent, of the net income each year, to be used in acquiring fixed or other assets for the trust.

The three physicians were the sole beneficiaries during the tax years involved.

In 1924 and 1925, the trustees employed, in addition to themselves, one physician, and in 1926 and 1927, three physicians.

The issue was whether the trust constituted an association, taxable as a corporation, or whether the individual members were taxable as partners under the Revenue Acts of 1924 and 1926.

Deficiencies were assessed by the Commissioner, on the ground that the trust was an association and taxable as a corporation. The Board of Tax Appeals sustained the deficiencies and the Court of Appeals affirmed, holding that the continuity of the enterprise, centralized control, limited liability and transferability of interests were present, and that there were substantial dissimilarities to a partnership.

Following Pelton, members of learned professions, because of increasingly higher income taxes and the realization that pension and profit-sharing plans would result in tax benefits, began to form associations for the practice of their professions, and claimed the tax advantages that flowed therefrom. This was particularly true of medical groups, which, under state law, could not carry on the practice of medicine through a corporation.

This led the Treasury Department to change its position, so instead of asserting, as theretofore, that such organizations should be treated as corporations for federal income tax purposes, it asserted that they should be regarded as partnerships for such purposes and were not entitled to the tax benefits they sought to obtain.

The correctness of the Treasury Department's new position came before the Ninth Circuit in the case of United States v. Kintner, 9 Cir., 216 F.2d 418, in 1954. In that case, a doctor of medicine, who will hereinafter be referred

to as the taxpayer, and his wife brought an action to recover a deficiency tax assessed for federal income taxes in 1948, which they had paid. From a judgment in favor of the taxpayer and his wife, the United States appealed.

The taxpayer, for many years prior to June 30, 1948, was a member of a co-partnership composed of eight physicians, who practiced medicine in Montana, under the name "Western Montana Clinic." On that date, the partnership was dissolved, and the eight physicians executed articles of association for the practice of medicine. The assets and liabilities of the partnership were taken over by the association. The articles of the association provided it should continue until the death of the last of the eight original members; that only physicians and surgeons licensed to practice medicine in Montana were eligible for membership; that the business of the association would be managed by an executive committee of five members, who would elect the officers of the association; that "only the members were to be liable to third parties for professional misconduct"; that the association would collect accounts receivable for services rendered by its members; that net earnings would be divided annually among the members in proportion to the salaries received and would be deemed compensation for services rendered by them; that the association would furnish members with the equipment needed to render professional services and pay all expenses incident to the practice of medicine and surgery by the members; that the death or retirement of a member would not result in dissolution of the association; and that on the withdrawal or death of a member, he or his estate would receive, instead of a share in the association's assets, the benefits of the pension plan, the expense of which was to be borne by the association.

The court held that the association more nearly resembled a corporation than a partnership and should be treated as a corporation for federal income tax purposes, and affirmed the judgment.

In Galt v. United States, N.D.Tex., 175 F.Supp. 360 (1959), a group of physicians executed articles of association, setting forth in substance all of the provisions that would have been set out in articles of incorporation of "an active" corporation or in its "charter issued to them under the laws of the State of Texas," had such laws permitted physicians to form corporations for the practice of medicine. The name of the association was the "Southwest Clinic Association," and it carried on the operation of the clinic substantially as it would have, had it been a corporation organized under the laws of Texas.

The court held that it was an association, taxable as a corporation.[13]

The members of the association in Kintner had only a qualified limitation on personal liability.

The Treasury Department did not seek review of Kintner by petition for certiorari, nor Galt by appeal. Instead, on November 15, 1960, it promulgated, under the Internal Revenue Code of 1954, Treasury Regulations 301.7701–2(a) (1), (2) and (3), with the purpose of indirectly overturning the decisions in Kintner and Galt. Indeed, that purpose was so obvious that such Regulations came to be referred to generally as the "Kintner Regulations." However, they are apparently directed only at unincorporated organizations.

Regulations long in effect, under § 3797(a) (2) and (3) of the Internal Revenue Code of 1939, (the predecessor of § 7701(a) (2) and (3) of the Internal Revenue Code of 1954) were based on the decision in Morrissey v. Commissioner, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935), and decisions and rulings under the Internal Revenue Code of 1939, holding that unincorporated organizations should be taxed as corporations, if corporate characteristics were present, and not as partnerships.

13. See also, Foreman v. United States, S.D.Fla., 232 F.Supp. 134 (1964).

The 1960 Regulations apparently were designed to make it as difficult as possible for professional groups, which formed unincorporated organizations to practice their professions, to obtain treatment of such associations as corporations for federal income tax purposes.

However, the 1960 Regulations, unlike the 1965 amendment thereto, contain no indication of a change in the long followed administrative practice of treating a corporation organized and chartered under state law as a corporation for federal income tax purposes. That was a practice that had been tacitly approved by the Congress, by its reenactment at least 11 times of the definition of the term "corporation" in substantially identical language.

Notwithstanding that the 1960 Regulations were designed to make it quite difficult for associations formed by professional groups to practice their professions, Foreman v. United States, S.D. Fla., 232 F.Supp. 134 (1964), held that an association formed by two physicians to operate an orthopedic clinic was taxable as a corporation, even though limited liability was absent from its corporate characteristics.

In the 1960 Regulations, the case law standards of continuity of life, centralization of management, limited liability and transferability of ownership interests were still used to govern, but the Treasury Department shifted its position as to the meaning of such criteria. An ex-ample was the flat position taken by the Treasury Department that an association subject to the Uniform Partnership Act of a state could never achieve such standards. Accordingly, beginning in 1961, Connecticut, Georgia, Illinois, Ohio and Pennsylvania adopted standards which permitted members of professions to form associations without being subject to the Uniform Partnership Acts of the states. Florida, Minnesota, Oklahoma, Tennessee and Wisconsin enacted statutes authorizing members of professions to carry on their practices through corporations organized under the general corporation laws of such states. They made specific provisions, however, to preserve traditional professional standards and professional responsibility to patients or clients, and prohibited the ownership of shares by unlicensed persons or persons not actively employed in a professional capacity by such a corporation.

The question of whether a corporation organized to practice a learned profession under the general corporation laws of a state, which had to meet requirements like those laid down in Rule 265, supra, was entitled to be treated as a corporation for federal income tax purposes, was adjudicated for the first time in the instant case.

The findings of the trial court, which are set forth in Note 14, are supported by the evidence, which is not in conflict, and are not clearly erroneous.[14]

14. "1. Drexler and Wald Company has associates.

"2. Its objective is to carry on the practice of law for profit and to divide the gains therefrom.

"3. By its charter it has perpetual life and it has continuity of life within the requirements of the regulations in that death, insanity, bankruptcy, retirement, resignation or expulsion of any member will not cause or require a dissolution of the corporation.

"4. The lawful authority of the company is vested in its directors and officers and the evidence discloses that the directors and officers have exercised their powers of management although routine matters are handled by the office manager.

"5. Shareholders are liable for corporate debts except during periods of time when the corporation shall maintain lawyers' professional liability insurance in specified amounts; the Court finds that Drexler and Wald has at all times carried such insurance in the specified amounts and that the nature of the liability of the shareholders of Drexler and Wald is more similar to that of a corporate shareholder than to that of a partner.

"6. The transferability of the shareholders' interests in Drexler and Wald is

The trial court, in a well reasoned opinion, held that the 1965 amendment was invalid, and that the corporation was entitled to be treated as a corporation for the purposes of federal income tax.[15] We agree with the conclusion of the trial court.

■ There has been no substantial change in the definition of the term "corporation" and the term "partnership" since the Revenue Act of 1932, and the definitions of those terms in the Internal Revenue Code of 1954 are identical with their definitions in the Revenue Act of 1939. The definition of a partnership, by its language, plainly refers to unincorporated organizations. To treat as a partnership for federal income tax purposes a corporation, organized and chartered under state laws as a corporation and operated as such in good faith, does violence to the statutory definitions of the terms "partnership" and "corporation," to long followed administrative practice prior to 1965, and to the decided cases dealing with analogous organizations. Moreover, Congress has not seen fit to take any legislative action to overturn such long standing practices and decisions, and the Treasury Department only undertook to do so by a greatly belated Regulation.

■■ We conclude the 1965 Regulations are "unreasonable and plainly inconsistent with the revenue statutes,"[16] and are therefore invalid. Moreover, we think the 1965 Regulations "amount to an attempt to legislate" and are therefore invalid.[17]

The judgment is affirmed.

---

restricted to transfers to lawyers who are actively engaged in the practice of law in the offices of the corporation or to the corporation.

"The Court further finds that the corporate characteristics of Drexler and Wald are such that the organization more nearly resembles a corporation than a partnership."

15. The decision in Empey v. United States, D.Colo., 272 F.Supp. 851, has been followed in the following cases:
O'Neill v. United States, N.D.Ohio, 281 F.Supp. 359;
Kurzner v. United States, S.D.Fla., 286 F.Supp. 839;
Holder v. United States, N.D.Ga., 289 F.Supp. 160;

Wallace v. United States, E.D.Ark., (decided October 31, 1968) 294 F. Supp. 1225.

16. See Commissioner v. South Texas Lumber Co., 333 U.S. 496, 501, 68 S.Ct. 695, 92 L.Ed. 831, where the court set forth the language last quoted as the test to be applied in determining the validity of Treasury Regulations.

17. The Supreme Court also has held that Treasury Regulations will be disregarded when they are contrary to the "unambiguous mandate of the statute" and when they "amount to an attempt to legislate." Helvering v. Sabine Transportation Co., 318 U.S. 306, 311, 312, 63 S.Ct. 569, 572, 87 L.Ed. 773.