Ballard F. SMITH and Helen Smith,
Plaintiffs,

v.

UNITED STATES of America,
Defendant.

No. 67–1133–Civ.

United States District Court
S. D. Florida.
April 14, 1969.

James O. Murphy, Jr., of Rimes & Greaton, Fort Lauderdale, Fla., for plaintiffs.

Lavinia L. Redd, Asst. U. S. Atty., Miami, Fla., for defendant.

## MEMORANDUM OPINION

FULTON, Chief Judge.

The Plaintiffs, Dr. and Mrs. Smith, instituted this action against the United States for a refund of income taxes in the amount of $7,954.39 for the year 1965. They claim that said amount was collected from them erroneously in that the Commissioner determined that Dornberger Smith Ferayorni McKay Lauderdale Group Professional Association (hereinafter referred to as the "Professional Association") was taxable as a partnership, rather than as a corporation, and that a distributable share of the partnership income in the amount of $14,462.50 was accordingly taxable to Dr. Smith as a 16⅔% partner in the Professional Association.

From 1957 to 1961, Dr. Smith practiced medicine in partnership with two other physicians, Drs. Dornberger and Ferayorni, and all three of them were physicians duly licensed under the laws of Florida. In 1959 the partnership, known as the Lauderdale Medical Group,

took in a fourth licensed Florida physician, Dr. McKay.

In October, 1961, the four partners agreed to organize a Florida corporation (Plaintiff's Exhibit 1) and pursuant to that Agreement, on October 20, 1961, the Professional Association was incorporated under Chapter 621 of the Florida Statutes, F.S.A. Its initial stockholders were the four former partners, Drs. Smith, Dornberger, Ferayorni and McKay, who agreed that no stockholder could transfer or encumber his shares of Professional Association stock without the unanimous consent of all others at a stockholders' meeting called specifically for that purpose.

At the time of its incorporation, the Professional Association acquired all of the assets and liabilities of the former partnership. (These assets included cash on hand and in banks in the amount of $2,000, the partnership goodwill, and a lease on the premises of 3000 Bayview Drive, Fort Lauderdale, Florida.) All of the former partnership's employees, including nurses, secretaries, and technicians, became employees of the Professional Association.

Following the incorporation, the four doctor-stockholders executed substantially identical employment contracts with the Professional Association. Dr. Smith's contract with the Professional Association (Plaintiff's Exhibit 2) required him to furnish professional services for the Professional Association on a year to year basis, for which he was to receive from the Professional Association either a certain percentage of his billings or a stipulated minimum guarantee, whichever was greater. The contract further provided that all medical records and case histories were and shall be the sole and permanent property of the Professional Association.

In accordance with Florida's Professional Service Corporation Act, Chapter 621, Florida Statutes, 1961, F.S.A., Article XI of the Professional Association's Articles of Incorporation (Plaintiff's Exhibit 4) precluded the issuance of any capital stock to anyone other than an individual who is a graduate physician licensed to practice in the State of Florida.

The Articles further precluded any stockholder from selling or transferring his stock in the corporation "without the unanimous approval, at a stockholders' meeting called specifically for such purpose, of all stockholders of the corporation." The stockholders were, however, permitted to adopt by-laws providing for purchase or redemption by the corporation of its shares. Article XII, Articles of Incorporation, Plaintiff's Exhibit 4. That provision is echoed in Article V, Section 3(a) of the By-Laws (Plaintiff's Exhibit 5), which also provides that if such unanimous consent is not granted, the corporation shall purchase all of that stockholder's stock.

Since its inception, the Professional Association has operated as a corporation. As prescribed by the By-Laws (Plaintiff's Exhibit 5), its affairs and business have been managed by the Board of Directors (who have been, since 1965, Drs. Smith, Dornberger and Ferayorni). The Board of Directors has held regular annual and monthly meetings and various special meetings in accordance with the By-Laws since incorporation, and written minutes of the regular meetings have been transcribed. Among the decisions concerning the day-to-day operation of the Professional Association made by the Board have been the following:

(a) Scheduling of professional and non-professional employees;

(b) Scheduling nights and week-ends on call for professional employees;

(c) Scheduling vacation times for all employees;

(d) Deciding upon and approving all purchases in excess of $50.00;

(e) Deciding when new professional and non-professional employees are needed;

(f) Hiring, firing and setting salaries of non-professional employees;

(g) Hiring professional employees, after consultation with all stockholders;

(h) Determining contributions to the Professional Association's profit-sharing plan, and deciding how the plan's funds are to be invested;

(i) Making lease arrangements for the building which the Professional Association occupies and the equipment it uses;

(j) Determining compensation of professional employees, within the terms of their respective employment contracts.

Stationery, medical and business forms have been printed, and all bear the Professional Association's name. The Professional Association maintains a bank account in its name and all checks issued in connection with the operation of the medical practice have been and are issued in the name of the Professional Association. All accounting records are kept in the name of the Professional Association and receipts for payments to the Professional Association, statements issued to patients and all accounting records relating to the patients are in the name of the Professional Association. The Professional Association, and not the individual physicians, is billed for materials furnished by suppliers. Once a patient is accepted by the Professional Association, no individual physician may refuse to treat that patient, and indeed, no individual physician may accept only those patients he wishes to treat. Over the course of years, a patient will see each physician employed by the Professional Association.

In the Professional Association's practice of medicine, there is no supervision of one physician over another, nor is there duplication of work by the physicians. Generally the physician who is then responsible for a patient who requires hospitalization admits that patient to the hospital. However in case of an emergency, the physician who is on call admits a patient requiring immediate hospitalization.

The physician who treats a patient sets the fee for that treatment, but he must and does do so within guidelines established by the Board of Directors. Moreover, fee charges are subject to, and have been, reviewed by the Board of Directors. All checks received by the Professional Association for medical services performed by physician-employees are deposited in the Professional Association's bank account. No fees are received or retained by an individual physician; each of the physicians is compensated by the Professional Association according to his employment contract with the Professional Association, which employment contract sets forth in detail all of the rights and duties of the physician relating to his employment by the Professional Association.

Each of the physician-employees of the Professional Association, including Dr. Smith, has individual malpractice insurance coverage with the Professional Association named as an additional insured. Since June, 1966, the malpractice insurance policy has insured the physician-employees both individually and as the Professional Association. Both policies cover acts performed by the insured as an individual and on behalf of the Professional Association. The premiums on all such malpractice policies are paid by the Professional Association.

At all times material to this action, Florida's Professional Service Corporation Act set forth the liabilities of employees of the Professional Association, as well as of the Association itself.

"Nothing contained in this act shall be interpreted to abolish, repeal, modify, restrict or limit the law now in effect in this state applicable to the professional relationship and liabilities between the person furnishing the professional services and the person receiving such professional service and to the standards for professional conduct. Any officer, shareholder, agent or employee of a corporation or-

ganized under this act shall remain personally and fully liable and accountable for any negligent or wrongful acts or misconduct committed by him, or by any person under his direct supervision and control, while rendering professional service on behalf of the corporation to the person for whom such professional services were being rendered. The corporation shall be liable up to the full value of its property for any negligent or wrongful acts or misconduct committed by any of its officers, shareholders, agents, or employees while they are engaged on behalf of the corporation in the rendering of professional services." Section 621.07, Florida Statutes, F.S.A.

The Professional Association has since 1961 been continuously engaged in the practice of medicine under Florida's Professional Service Corporation Act. It has timely filed a corporate Federal Income Tax Return for each and every calendar year since its incorporation in 1961. Each and every year since 1961 it has also filed Federal Payroll Tax Returns (Form 941) for all of its employees, including its physician employees (and thus including Dr. Smith), which Payroll Tax Returns include the withholding of income tax from wages and social security taxes. W–2 statements reporting income tax withholding for each employee of the Professional Association, including the physician employees, were likewise filed by the Professional Association.

During the year 1965 the Plaintiff Dr. Smith was employed as a physician by the Professional Association, and he owned thirty-five shares of its outstanding capital stock. Dr. Smith did then and does now reside in Broward County, Florida. Dr. and Mrs. Smith, the Plaintiffs herein, were then and are now married, and they filed a joint individual income tax return for the taxable year ending December 31, 1965, which return was filed with Florida's District Director of Internal Revenue on or about April 15, 1966.

Thereafter the Commissioner of Internal Revenue determined that the Professional Association was taxable as a partnership, rather than as a corporation. He further determined that Dr. Smith was a 16⅔% partner of that "partnership" for the year 1965 and that there was accordingly taxable to Dr. Smith as his distributable share of the "partnership" income for 1965 the additional amount of $14,462.50. The Commissioner thus assessed against Dr. and Mrs. Smith additional income taxes in the amount of $7,954.39 for the year 1965, which amount, together with interest thereon, was paid by the Smiths in February, 1967. On April 27, 1967 Plaintiffs duly filed with Florida's District Director of Internal Revenue a claim for refund of said additional income tax and interest. This claim was rejected by the District Director on November 6, 1967.

In asserting that the Professional Association was, for Federal income tax purposes, a partnership and not a corporation, the Government relies upon §§ 7701(a) (2) and (3) of the Internal Revenue Code and the Regulations promulgated thereunder, particularly the so-called "Kintner Regulations," §§ 301.-7701–1 and 301.7701–2, Treasury Regulations, as amended in 1965. Alternatively, the Government contends that even if the 1965 addition to the Kintner Regulations [§ 301.7701–2(h), Treasury Regulations] is held to be invalid, the Professional Association should still be considered a partnership based upon the 1960 Regulations and the criteria set forth in Morrissey v. Commissioner of Internal Revenue, 296 U.S. 344, 56 S.Ct. 289, 80 L.Ed. 263 (1935).

Section 7701(a) of the Internal Revenue Code defines the words "partnership" and "corporation" as follows:

> (2) *Partnership and partner*—The term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization, through or by means of which any business, financial operation, or venture is carried on, and which is not,

within the meaning of this title, a trust or estate *or a corporation;* and the term "partner" includes a member of such a syndicate, group, pool, joint venture, or organization.

(3) *Corporation*—The term "corporation" includes associations, joint-stock companies, and insurance companies (emphasis added).

The definition of "corporation" in Section 7701(a) (3) of the 1954 Internal Revenue Code quoted above is identical with the one contained in the Revenue Acts of 1924 and 1926, under which arose the landmark *Morrissey* case, *supra.* The Court there established that the proper classification of unincorporated organizations for federal tax purposes depended upon whether their essential characteristics were those of a partnership or those of a corporation. The Court set forth four criteria the presence or absence of which should determine an organization's tax status:

(a) continuity of life;

(b) limited personal liability on the part of participants;

(c) centralized management through representatives of the members of the organization;

(d) transferability of interests in the organization.

Some years later, the *Morrissey* criteria were applied to an unincorporated association of physicians in United States v. Kintner, 216 F.2d 418 (9 Cir. 1954). The Kintner court held that the association was to be treated as a corporation, notwithstanding the fact that each physician remained individually liable for his own negligence or lack of skill and the association disclaimed liability therefor. The same result was reached in Galt v. United States, 175 F. Supp. 360 (N.D.Tex.1959). It should be noted that neither the association in *Kintner* nor the one in *Galt* could take advantage of a state statute permitting physicians and other professionals to incorporate.

In response and reaction to the *Kintner* and *Galt* cases, in the following year (1960), the Treasury adopted the regulations immediately dubbed the "Kintner Regulations," upon which the Government relies here, §§ 301.7701–1 and 301.-7701–2 Treasury Regulations, which regulations deal with determining whether an organization shall be treated as a corporation or as a partnership for federal income tax purposes. These regulations appear to be primarily concerned with unincorporated organizations which sought tax treatment as corporations, such as the situations in *Morrissey, Kintner, Galt,* and related cases.

Then, because the 1960 Regulations took the position that a partnership or association subject to a statute corresponding to the Uniform Partnership Act could not qualify as a corporation for tax purposes, a number of states began to adopt statutes enabling professionals to incorporate, and as of this date, approximately thirty-seven states have such statutes, including, of course, Florida.

After losing again in Foreman v. United States, 232 F.Supp. 134 (S.D. Fla.1964), and after adoption of such statutes by many states, the Treasury again amended its Regulations, this time dealing specifically with the "classification of professional service organizations." § 301.7701–2(h), Treasury Regulations, 1965. It is upon this 1965 amendment that the Government relies most heavily in this case, and it is this amendment which the Plaintiffs contend is invalid.

■■ Treasury regulations are entitled to substantial weight in the courts, Lykes v. United States, 343 U.S. 118, 72 S.Ct. 585, 96 L.Ed. 791 (1952), and must be upheld unless they are unreasonable and plainly inconsistent with revenue statutes. Fawcus Mach. Co. v. United States, 282 U.S. 375, 51 S.Ct. 144, 75 L. Ed. 397 (1931); Commissioner of Internal Revenue v. South Texas Lumber Co., 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1947). However a court may consider the reasonableness of such a regulation, especially where, as here, the regulation

was not issued contemporaneously with the promulgation of the Code provision which it seeks to interpret, it does not embody a long-standing interpretation, and there has been no evidence of re-enactment by Congress. 1 Davis Administrative Law, Ch. 5, Interpretative, Legislative, and Retroactive Rules, § 503, p. 300 (1958). See generally, Eisenstein, Some Iconoclastic Reflections on Tax Administration, 58 Harv.L.Rev. 477 (1945); Griswold, A Summary of the Regulations Problem, 54 Harv.L.Rev. 398 (1941); Feller, Addendum to the Regulations Problem, 54 Harv.L.Rev. 1311 (1941); Surrey, The Scope and Effect of Treasury Regulations Under the Income, Estate, and Gift Taxes, 88 U. of Pa.L.Rev. 556 (1940).

The 1965 amendment, § 301.7701–2(h), Treasury Regulations, permits the Commissioner to determine that validly incorporated professional service organizations constitute partnerships for federal income tax purposes if they more closely resemble partnerships than corporations. Detailed criteria are set forth in the regulation to guide the Commissioner in making his decision; however, it cannot be doubted that except for the most unusual circumstances, these criteria preclude all professional service organizations from achieving corporate tax status. One need only compare Section 301.7701–2(h) with sections 301.7701–2(a)–(g) to perceive this phenomenon. At once, it becomes apparent that a dual set of criteria exists. One set is for the non-professional organization; the other and much stricter set of criteria is for the professional service organization. There is no support for this discrimination either in the cases or elsewhere. There is no factual or legal characteristic which would justify different tax treatment of closely held professional service organizations on the one hand and closely held non-professional service organizations on the other hand.

"The fallacy of [the Treasury's] argument is readily apparent when one considers the large number of corporations presently existing in our economy whose primary income is earned solely from the personal service of employees. The corporate tax status of businesses engaged in advertising or promotion, investigation, sales, contract janitorial or secretarial service, to name a few, has not been seriously questioned to this Court's knowledge." Foreman v. United States, 232 F. Supp. 134, 137 (S.D.Fla.1964).

Aside from the above, the regulation herein involved contradicts the clear and unequivocal language of § 7701(a) of the Internal Revenue Code of 1954. The Professional Association is validly incorporated under Florida law. According to the unequivocal express terms of § 7701(a), it cannot constitute a partnership for tax purposes and must constitute a corporation. There simply is no precedent in case law for the proposition that an organization validly incorporated under state law is taxable as a partnership rather than a corporation aside from the "business purpose" rule of Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935); Anderson, Tax Aspects of Professional Corporations, U.S.C. 15th Tax Inst. 398 (1963); Eaton, Professional Associations as Planning Techniques, N.Y.U. 24th Inst. on Fed. Tax 671 (1966); Note, Professional Corporations and Associations, 75 Harv.L.Rev. 756 (1962); Scallen, Federal Income Taxation of Professional Associations and Corporations, 49 Minn.L.Rev. 603 (1965).

█ There is precedent for the proposition that because Treasury Regulation 301.7701–2(h) contradicts the clear language of § 7701(a) of the Code, it is invalid. See Empey v. United States, 272 F.Supp. 851 (D.Colo.1967), affirmed 406 F.2d 157, (10 Cir.1969); and O'Neill v. United States, 281 F.Supp. 359 (N.D.Ohio 1968). The Court need not and does not at this time reach such a conclusion. As previously noted, there is another reason why the Commissioner's ruling cannot be sustained. Suffice it to say that the apparent inconsistency between the Regulation and the Code is

but another factor supporting the conclusion that the Regulation is unreasonable. The unreasonableness of the Regulation is brought into sharper focus when it is read in juxtaposition with Morrissey v. Commissioner, *supra*; United States v. Kintner, *supra*; Galt v. United States, *supra*; and Foreman v. United States, *supra*.

When analyzed in terms of the four *Morrissey* factors set forth above, this case is more deserving of the corporate tax status than *Kintner*, *Galt* and *Foreman*. The Professional Association's Articles of Incorporation provide for perpetual existence. The stockholders of the Professional Association, by virtue of the provisions of § 621.13, Florida Statutes, F.S.A., have sharply limited liability. Their liability differs from the liability of a stockholder in any other corporation only in that each is personally liable for negligent or wrongful acts performed by him or by any employee under his direct supervision or control. Shareholder liability in the *Kintner, Galt,* and *Foreman* cases was unlimited. Centralized management in the Professional Association is identical to that in *Kintner, Galt,* and *Foreman.* In each case there was either an Executive Committee, Board of Directors, or Board of Governors that managed the affairs of the associates. No special significance can be attached to the fact that Dr. Smith was both a stockholder and Board member. This situation is found in the myriad of general corporations in Florida which have only one or two stockholders. Stock in the Professional Association is transferable, but only to another licensed physician and only with the consent of all of the stockholders. A similar limitation upon transferability is found in *Galt* and *Foreman.* In *Kintner,* the interests of the members were non-assignable. Notwithstanding the limitation that is present in this case, the ability to transfer interests without disturbing continuity of the enterprise and the ability to issue interests to large numbers of participants is not affected. It is the latter factor and not the presence or absence of limitations on transferability per se that is important. Indeed, the limitation involved herein provides the very cornerstone for assuring that no one but a member of the profession, be he doctor, attorney, certified public accountant, or otherwise, can exercise a voice in the policy of the organization. To permit a non-professional person to exercise a voice in policy may well be unethical in most professions.

██ In view of all of the foregoing, the Court concludes that Section 301.-7701–2(h), Treasury Regulations, 1965, is unreasonable, and therefore invalid. The Court further finds and concludes that even applying the 1960 Kintner Regulations and the *Morrissey* criteria, the Professional Association should be treated as a corporation, rather than as a partnership. See Empey v. United States, *supra;* First National Bank and Trust Co. of Tulsa, Okl. v. United States, Civil No. 68C 28, D.Okl. March 4, 1969; Cochran v. United States, 299 F.Supp. 1113, D.Arizona; Wallace v. United States, 294 F.Supp. 1225 (E.D. Ark.1968); Holder v. United States, 289 F.Supp. 160 (N.D.Ga.1968); Kurzner v. United States, 286 F.Supp. 839 (S.D. Fla.1968); O'Neill v. United States, *supra*. See also St. Louis Park Medical Center v. Lethert, 286 F.Supp. 271 (D. Minn.1968). Finally, the Court concludes that it has jurisdiction over the subject matter hereof, by virtue of 28 U.S.C. § 1346(a).

This Memorandum Opinion shall serve in lieu of separate findings of fact and conclusions of law in this case. Counsel for the Plaintiffs is hereby directed to submit an appropriate judgment form in conformity with this Memorandum Opinion within ten days of the date of entry hereof.